## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE: | ) | No._____ |
| | ) | |
| GENERAL MOTORS LLC IGNITION | ) | Case No. |
| SWITCH LITIGATION | ) | |
| | ) | COMPLAINT |
| This Document Relates to: | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| FRANCILLA MAGEE, TRAMEKA | ) | |
| SERMON AS PARENT AND NATURAL | ) | |
| GUARDIAN OF T.S., A MINOR AND | ) | |
| D.D., A MINOR; ANNIE DAWSON | ) | |
| CARMEL AS GUARDIAN OF N.D., A | ) | |
| MINOR; AND COLETHA | ) | |
| YOUNGBLOOD AS PARENT AND | ) | |
| NATURAL GUARDIAN OF V.B., A | ) | |
| MINOR, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GENERAL MOTORS LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## <u>COMPLAINT</u>

**COME NOW PLAINTIFFS**, Francilla Magee, Trameka Sermon as parent and natural guardian of T.S., a minor and D.D., a Minor; Annie Dawson Carmel as guardian of N.D., a minor; and Coletha Youngblood as parent and natural guardian of V.B., a minor ("Plaintiffs"), by and through undersigned Counsel of Record, and files this Complaint against Defendant General Motors LLC ("New GM" or "Defendant") based upon information and belief and the investigation of counsel to date, to state and allege as follows:

1

**NATURE OF THE ACTION**

1.      This case arises out of a single car automobile accident on the afternoon of April 26, 2014, in Pike County, Mississippi, in which the vehicle left the roadway and struck a tree (hereinafter the "Incident").

2.      The Plaintiffs Francilla Magee and T.S. ("Minor Plaintiff T.S."), then aged 10, N.D. ("Minor Plaintiff N.D."), then aged 11, D.D. ("Minor Plaintiff D.D."), then aged 2, and V.B. ("Minor Plaintiff V.B."), then aged 10, were injured while riding in a Black 2002 Cadillac Deville Vehicle, VIN No. 1G6KD54Y82U229809 (hereinafter the "Vehicle") manufactured by General Motors Corporation ("Old GM").

3.      The Vehicle was recalled on June 20, 2014 as a part of Recall 14V355, more than two months after the Incident.

4.      As a result of the April 26, 2014 motor vehicle accident, Francilla Magee, Minor Plaintiff T.S., Minor Plaintiff N.D., Minor Plaintiff D.D., and Minor Plaintiff V.B. suffered injuries that continue to cause pain and suffering to this day.

5.   New GM has admitted that Old GM equipped various model year vehicles with defective ignition switches. The defect at issue is a low-torque ignition switch that may move out of the "run" and into the "off" or "accessory" position. If this movement occurs, the driver loses assistance of power steering and power brakes. And if a collision occurs while the ignition switch is not in the "run" position, the vehicle's safety airbags will not deploy—increasing the risk of death and serious injury. Despite knowing that the ignition switch installed in the Vehicle was defective, Old GM failed to adequately warn Plaintiff about the risk of harm and failed to recall the Vehicle.

6.   On July 10, 2009, the United States Bankruptcy Court for the Southern District of New York entered an order approving the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement (the "Sale Order"), wherein New GM acquired certain Old GM assets. Because Plaintiff asserts Products Liability claims within the meaning of the Sale Order through which New GM acquired substantially all the assets of Old GM, Plaintiff properly bases the Products Liability claims for damages on the conduct of both Old GM and Defendant New GM.

7.   Prior to New GM's acquisition of Old GM's assets, Old GM knew it had installed defective ignition switches into millions of vehicles, including Plaintiff's vehicle, and failed to warn consumers or recall the defective vehicles. Indeed, Old GM willfully and deliberately concealed the defect. Because, under Mississippi law, New GM is a mere continuation of Old GM, Plaintiff properly bases certain punitive damages claims on the conduct of Old GM.

8.   After the sale, New GM retained a great number of Old GM personnel, including at least twenty-four engineers, lawyers, and executives who knew about the ignition switch defect while acting within the scope of their authority at Old GM. New GM also retained Old GM's books and records, which indicated, inter alia, that Old GM had manufactured and sold millions of vehicles containing a defective ignition switch. As a result of these employees and documents, New GM inherited information about Old GM's knowledge and conduct with respect to the ignition switch defect. New GM also acquired its own independent knowledge and committed its own independent misconduct regarding the ignition switch defect after the bankruptcy sale.

9.   Despite knowing that Old GM had installed defective ignition switches into millions of vehicles, failed to warn consumers, and failed to recall the defective vehicles, New GM also failed to warn consumers and failed to recall the defective vehicles and did so for almost five years. And despite ever-increasing post-sale knowledge of the ignition switch defect, including the

3

connection between the ignition switch defect and airbag non-deployment and the ignition switch defect's deadly consequences, New GM deliberately concealed the defect, delayed the recall, misrepresented to consumers that vehicles containing the defect were safe, and failed to adequately notify Plaintiff about the Vehicle's ignition switch defect. New GM intentionally delayed the ignition switch defect recall in order to minimize harm to the corporation. Defendant further engaged in a scheme to cover up that knowledge and deny any responsibility for the defect, inter alia, misrepresenting the scope of the defect even after the accident at issue in this Complaint occurred.

10.    Accordingly, Plaintiffs bring this action against Defendant General Motors LLC for negligence, strict liability, and fraudulent concealment under applicable law. Further, Plaintiffs seek punitive damages based solely on New GM's knowledge and conduct, including information inherited from Old GM's employees and documents and information obtained by New GM after the Sale. Plaintiff seeks further punitive damages based on Old GM's knowledge and conduct, which New GM – as a mere continuation of Old GM – is liable for.

11.    Plaintiff now has information and belief that certain operational parts in that Vehicle were knowingly defective, and/or improperly designed, manufactured, or installed by Old GM and failed to prevent, proximately caused, and/or directly resulted in the personal injuries and collision that occurred.

12.    Plaintiff also has since learned that, despite its prior knowledge, Defendant New GM deliberately failed to notify Plaintiff adequately about the ignition switch defect in the Vehicle before the accident's occurrence. Defendant further has engaged in a scheme to cover up its knowledge and deny any responsibility for the defect by misrepresenting the scope of the defect even after the accident at issue in this Complaint occurred.

13.     Therefore, Plaintiffs come now to bring this action individually to recover any and all economic and non-economic damages they has incurred, including but not limited to damages for physical injuries and pain and suffering sustained as a result of the crash and accident.

## THE PARTIES, JURISDICTION, AND VENUE

14.     At all times relevant herein, Plaintiff Francilla Magee, Minor Plaintiffs T.S., N.D., and D.D., are and were residents of Magnolia in Pike County, Mississippi.

15.     At all times relevant herein, Minor Plaintiff V.B. is and was a resident of Tylertown in Walthall County, Mississippi.

16.     Plaintiff Francilla Magee, and Minor Plaintiffs T.S., N.D., D.D., and V.B. bring this action to recover damages for their individual injuries including the economic and non-economic damages incurred.

17.     At all times relevant herein, Defendant New GM is and was a for-profit corporation organized under the laws of the State of Delaware with its principal place of business located at 300 Renaissance Center, Detroit, Michigan, 48265, and is a citizen of the States of Delaware and Michigan.

18.     The sole member and owner of General Motors LLC is General Motors Holding LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan.

19.     The sole member and owner of General Motors Holdings LLC is General Motors Company, which is a Delaware Corporation with its principal place of business in the State of Michigan, and is a citizen of the States of Delaware and Michigan.

20.     New GM was incorporated in 2009 and, effective on July 10, 2009, acquired substantially all assets and assumed certain liabilities of General Motors Corporation through a Section 363 sale

under Chapter 11 of the U.S. Bankruptcy Code. It is undisputed that New GM had express obligations, as well as obligations by law, to comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Act and the Transportation Recall Enhancement, Accountability and Documentation Act, including with respect to Old GM vehicles.

21.     General Motors LLC does business in the State of Mississippi with its principal domestic address located at CSC OF RANKIN COUNTY INC, Mirror Lake Plaza, 2829 Lakeland Drive Suite 1502, Flowood, MS 39232.

22.     At all times relevant herein, the event out of which this cause of action arose occurred on the afternoon of April 26, 2014, in Pike County, Mississippi.

23.     In June 2009, General Motors Corporation ("Old GM") filed for bankruptcy. On July 9, 2009, the United States Bankruptcy Court approved the sale of substantially all of Old GM's assets pursuant to a Master Sales and Purchase Agreement ("Agreement"). The Agreement became effective on July 10, 2009. The Agreement approved the sale of Old GM's assets to Defendant General Motors LLC, New GM.

24.     The Agreement defines Defendant's "Purchased Assets" as:

> (xiv)    all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials (in whatever form or medium), including Tax books and records and Tax Returns used or held for use in connection with the ownership or operation of the Purchased Assets or Assumed Liabilities, including the Purchased Contracts, customer lists, customer information and account records, computer files, data processing records, employment and personnel records,

advertising and marketing data and records, credit records, records relating to suppliers, legal records and information and other data;

(xv)    all goodwill and other intangible personal property arising in connection with the ownership, license, use or operation of the Purchased Assets or Assumed Liabilities; . . . .

Amended and Restated Master Sale and Purchase Agreement at Section 2.2.

25.    Along with the Purchased Assets, Defendant New GM also expressly took on a range of liabilities. "Liabilities" is defined in the Agreement as "any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on or off-balance sheet or otherwise, or due or to become due, including Indebtedness and those arising under any Law, Claim, Order, Contract or otherwise."

26.    Among many others, the Liabilities assumed by Defendant New GM under the Agreement include:

(vii)    (A) all Liabilities arising under express written warranties of Sellers [i.e., old GM] that are specifically identified as warranties and delivered in connection with sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser [i.e., New GM] prior to or after the Closing and (B) all obligations under Lemon Laws; . . .

(ix)    all Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for

operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by Sellers (collectively, "Product Liabilities"), which arise directly out of accidents, incidents, or other distinct and discreet occurrences that happen on or after the Closing Date and arise from such motor vehicles' operation or performance; . . .

(xi)    all Liabilities arising out of, relating to, in respect of, or in connection with the use, ownership or sale of the Purchased Assets after the Closing; . . .

27.    Defendant New GM also undertook contractual responsibility for compliance with a wide range of laws and other regulations, including: (a) From and after the Closing, Purchaser [Defendant New GM] shall comply with the certification, reporting, and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller [Old GM]. (b) From and after the Closing, Purchaser [Defendant New GM] shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers [Old GM] . . . (ii) Lemon Laws.

28.    Pursuant to the Agreement and other orders of the Bankruptcy Court, Defendant New GM purchased the assets of Old GM and hired many, if not most, of Old GM's employees including, on information and belief, most of the same senior-level management, officers, and directors.

29.    New GM is also liable for successor liability claims under Mississippi law as Old GM's mere continuation:

a)      After the Bankruptcy Sale, there existed a continuity of shareholders and ownership, management, personnel, physical location, and business operations between Old GM and New GM. As consideration for the sale, Old GM was given 10% of New GM's stock, with two warrants to purchase an additional 15%, giving Old GM the ability to own and control 25% of New GM. The vast majority of Old GM's management continued in their roles at New GM after the Bankruptcy Sale, as well as the majority of Old GM's personnel and employees. The physical location and business operations of New GM are essentially identical to those of Old GM. The address of New GM's principal executive offices did not change after the Bankruptcy Sale. New GM also assumed the goodwill of Old GM after the sale, and continued manufacturing many of the same automobile brands.

b)      New GM did not pay Old GM sufficient consideration for the Bankruptcy Sale. No cash consideration was given for the sale, which was an all-stock transaction.

c)      Shortly after the Bankruptcy Sale, Old GM ceased business operations and dissolved. Old GM remained in existence for 18 months after the Bankruptcy Sale solely to arrange its own liquidation.

d)      New GM was incorporated solely for the purpose of acquiring Old GM's viable assets, and, as part of the Bankruptcy Sale, acquired certain of Old GM's liabilities and subsidiaries, thus agreeing to pay Old GM's debts.

e)      After the sale, New GM held itself out to the public as a continuation of Old GM. For example, in April 2010, General Motors Company Chairman and CEO Ed Whitacre starred in a video commercial on behalf of New GM, asking Americans to give "GM a second chance."

30.    The allegations pertaining to Old GM above are included for purposes of background and context, and to set forth the scope of Defendant New GM's liabilities and responsibilities under the Agreement and as a mere continuation of Old GM. This Complaint does not assert any causes of action against Old GM; all causes of action and attributions of liability are directed solely against Defendant General Motors LLC, New GM.

31.    This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy for the Plaintiff exceeds $75,000, and Plaintiff is a citizen of a different state than Defendant. Jurisdiction is also proper in this Court as it has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

32.    Pursuant to the Court's instructions, Plaintiffs may file directly in the MDL court and reserve the right to have filed in another district. Plaintiffs filed in this District in order to advance the efficient and orderly resolution of claims arising from Defendant's conduct and its attendant nationwide devastating effects. Filing in this District does not alter the choice-of-law analysis and does not waive Plaintiffs' rights to transfer to another district at the conclusion of pretrial proceedings in this case. Therefore, this Complaint is filed by Plaintiffs as if they had filed in the district in which their accidents occurred, or other lawful jurisdiction. For Plaintiff Francilla Magee, Minor Plaintiff T.S., Minor Plaintiff N.D., Minor Plaintiff D.D., and Minor Plaintiff V.B. this Complaint is filed as though it were filed in the Southern District of Mississippi, Western Division.

33.    This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over New GM because New GM conducts substantial business in this District, and upon information and belief, consents to jurisdiction.

34.     Venue is proper in this District under 28 U.S.C. § 1391 because New GM, as a corporation, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.

## THE INCIDENT

35.     On the afternoon of April 26, 2014, Plaintiffs Francilla Magee, T.S., N.D., D.D. and V.B., were riding responsibly in the Vehicle in Pike County, Mississippi while in route to get an after school snack.

36.     Suddenly and without warning, the driver of the Vehicle, Francilla Magee, lost control.

37.     While navigating a gentle bend on southbound Fernwood Road, the Vehicle veered to the right, traveled off of the paved surface, and violently struck a tree on the side of the road.

38.     Plaintiffs Francilla Magee, T.S., N.D., and V.B. were appropriately restrained by seat belts and Plaintiff D.D. was appropriately restrained in his child safety seat.

39.     Upon impact, Plaintiffs Francilla Magee, T.S., N.D., D.D. and V.B. suffered physical injuries.

40.     Upon information and belief, safety defects in the Vehicle caused the crash that ultimately led the Plaintiffs' injuries.

41.     More specifically, upon information and belief, a defect in the ignition switch in the Vehicle caused the key to unintentionally move away from the "run" position during the Incident and interfered with the engine power, power steering and/or power braking functions in the Vehicle.

42.     Upon information and belief, the loss of engine power, power steering, and/or power braking functions caused the Vehicle to leave the roadway and prevented Plaintiff Francilla Magee

from stopping the Vehicle before it struck the tree, ultimately causing the Plaintiffs' injuries during the April 26, 2014 crash.

43.    Old GM was one of the largest vehicle manufacturers in the United States and designed and manufactured the Vehicle at issue in this Complaint sometime in or around 2002.

44.    Prior to the Incident on April 26, 2014, Defendant New GM had not reported any potential problems with the Vehicle and/or any other vehicles of its kind and had not recalled the Vehicle and/or any other vehicles of its kind for defects or other design/operational issues.

45.    Despite that fact, however, upon information and belief, prior to April 26, 2014, Defendant New GM was in the business of designing, manufacturing, testing, and selling and/or distributing vehicles in Mississippi that were knowingly unsafe and dangerous, defective, and/or hazardous for the public consumers' ordinary use, including but not limited to the Vehicle at issue in this Complaint.

46.    Also upon information and belief, Defendant New GM knew about the safety-related defects in the Vehicle at issue in this Complaint since the date of its incorporation in 2009 and significantly before the subject Recall was issued, but did nothing to recall, remedy, warn, or protect against the problem prior to the time that the April 26, 2014 Incident occurred.

47.    As a result, although the Vehicle and its component sub-assemblies were in the same essential condition as they were at the time it left Defendant's control, at the time of the Incident, the aforementioned Vehicle was defective in its design and was not reasonably safe to drive.

48.    Had the Vehicle and/or its component parts functioned properly, however, on April 26, 2014, the Incident at issue in this Complaint may have never occurred.

49.    Therefore, by reason of the foregoing, and for its failure to provide a Vehicle that was reasonably safe for its intended use on April 26, 2014, Defendant GM is liable to the Plaintiffs

Francilla Magee, T.S., N.D., D.D. and V.B. for all damages, injuries and losses that they have

suffered and sustained as a result of the Incident at issue in this Complaint.

## FACTS COMMON TO ALL COUNTS

### A.    New GM's Duty to Disclose Serious Safety Defects

50.    Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully

herein.

51.    Upon information and belief, the Vehicle at issue in this Complaint had safety-related

design defects making it unsafe to operate on April 26, 2014.

52.    Based upon the evidence that has recently come to light, Defendant New GM had

knowledge about these defects in its 2002 vehicles, but intentionally, purposely, fraudulently, and

systematically concealed that information from the public up until its first recall in February of

2014.

53.    Defendant New GM has received reports of crashes, deaths, injuries, and safety concerns

expressed by owners of both Old GM and New GM vehicles that put Defendant New GM on notice

of the serious safety issues presented by many of these defects. Defendant New GM knew and was

fully aware of the now infamous ignition switch defect (and many other serious defects in

numerous models of Old GM vehicles) from the very date of its inception on July 10, 2009. For

example, at least two dozen Old GM employees, many high-level or in positions of influence,

knew of the defects as of that date, and, under governing principles of Mississippi agency law,

their knowledge is imputed to New GM.

54.    Under the Motor Vehicle Safety Act (the "Safety Act"), 49 U.S.C. §30101 et seq., and the

Transportation Recall Enhancement, Accountability, and Documentation Act (the "Tread Act"),

49 U.S.C § 30170, Defendant New GM is required to recall and repair motor vehicle defects related

to safety or which cause the vehicle to be non-compliant with the Federal Motor Vehicle Safety Standards ("FMVSS").

55.     Under the Safety Act, the Secretary of Transportation "shall prescribe motor vehicle safety standards." 49 U.S.C § 30111(a). The Act prohibits, with certain limited exceptions, the manufacture for sale or the delivery in interstate commerce of any vehicle that does not comply with the standards promulgated in accordance with the Act. 49 U.S.C. § 30112(a).

56.     The Safety Act requires that a manufacturer of motor vehicles certify to the distributor or dealer that the "vehicle or equipment complies with applicable motor vehicle safety standards." 49 U.S.C. § 30115.

57.     If a manufacturer learns that a vehicle contains a defect and that defect is related to motor safety or the vehicle does not comply with proper application of the FMVSS, the manufacturer must inform the Secretary of Transportation. 49 U.S.C. § 30118(c)(1)-(2). If the Secretary of Transportation determines that the vehicle is defective or noncompliant with the FMVSS, it will require the manufacturer to notify the owners, purchasers and dealers of the defect and require it to remedy the defect or noncompliance. 49 U.S.C. §30118 (b) (2) (A) & (B).

58.     Defendant New GM violated the Tread Act by failing to timely inform NHTSA of the ignition switch defects and allowed vehicles to remain on the road with these defects. These same acts and omissions also violated various State consumer protection laws as detailed below.

59.     On May 16, 2014, Defendant New GM entered into a Consent Order with NHTSA in which it admitted that it violated the TREAD Act by not disclosing the ignition switch defect that gave rise to the February and March 2014 recalls, and agreed to pay the maximum available civil penalties for its violations. The ignition switch defects that gave rise to the February and March 2014 recalls are the same defects that gave rise to the June 2014 recalls.

60.    If Defendant New GM had informed the Secretary of Transportation that its vehicles were not in compliance with FMVSS 206, the Secretary would have required it to notify owners, purchasers and dealers, and to remedy the defect in accordance with 49 U.S.C. § 30119.

61.    Thus, Defendant New GM had a duty to warn the Plaintiffs of defective and noncompliant parts, ignition switch problems, and/or brake or power steering issues in its Vehicles, and to have remedied those defects prior to the time that the accident at issue in this Complaint occurred.

62.    Alternatively, even if Defendant New GM believed the Vehicle to have complied, it knew that certain defective parts in its vehicles, the Vehicle, or other like vehicles were unsafe and in a defective condition such that it had a duty to fully disclose and warn purchasers, owners, and dealers about those defects and of the potential dangers they presented and should have remedied those defects as well.

63.    At all times relevant to this Complaint, the Defendant New GM engaged in a scheme to keep concealed known and identified defects and to permit dangerous vehicles to remain on the road, to avoid the cost of recalling and/or repairing the unsafe and defective vehicles at the expense of the public and their safety.

### B.    GM's Fraudulent Conduct in Concealing the Defects

#### 1)    GM First Learns About The Safety-Related Defects in its Vehicles

64.    Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

65.    In 2001, during developmental testing of one of its vehicles – the 2003 Saturn Ion – Old GM first learned that the engines in those vehicles were stalling due to "low detent plunger force" in the ignition switch. At that time, however, Old GM chose not to fix, disclose, or address the problem or those defects discovered.

15

66.     More than 12 million GM-branded vehicles, including the Vehicle, contained a defective ignition switch and cylinder. In these vehicles, the key position of the lock module is located low on the steering column, in close proximity to the driver's knee. The ignition switch in these vehicles, the "Defective Ignition Switch Vehicles," is prone to fail during ordinary and foreseeable driving situations.

67.     The consequences of product failure in each of the recalled vehicles caused the vehicle to stall, disabling the power steering and power brakes, and disabling the airbag system in normal and foreseeable driving circumstances.

68.     More specifically, the ignition switch in the Defective Ignition Switch Vehicles can inadvertently move from the "run" to the "accessory" or "off" position at any time during normal and proper operation of the Defective Ignition Switch Vehicles. The ignition switch is most likely to move when the vehicle is jarred or travels across a bumpy road; if the key chain is heavy; if a driver inadvertently touches the ignition key with his or her knee; or for a host of additional reasons. When the ignition switch inadvertently moves out of the "run" position, the vehicle suddenly and unexpectedly loses engine power, power steering, and power brakes, and certain safety features are disabled, including the vehicle's airbags. This leaves occupants vulnerable to crashes, serious injuries, and death.

69.     The ignition switch systems at issue are defective in at least three major respects. First, the switches are simply weak; because of a faulty and below specification "detent plunger," the switch can inadvertently move from the "run" to the "accessory" position. Second, because the ignition switch is placed low on the steering column, the driver's knee can easily bump the key (or the hanging fob below the key) and cause the switch to inadvertently move from the "run" to the "accessory" or "off" position. Third, when the ignition switch moves from the "run" to the

"accessory" or "off" position, the vehicle's power is disabled. This also immediately disables the airbags. Thus, when power is lost during ordinary operation of the vehicle, drivers and passengers are left without the protection of the airbag system even if traveling at high speeds. Defendant New GM was aware of safer alternative designs for airbag systems that would have prevented the non-deployment of airbags caused by the ignition defects, but chose not to employ them, in part to avoid disclosure of the defective ignition switch and its tragic consequences. Old GM had the same awareness and made the same choices.

70.     In 2002, Old GM first began manufacturing and selling 2003 Saturn Ions with the known ignition switch defects, and later it began selling Chevrolet Cobalts and many other different types of vehicles (including but not limited to those vehicles those included on the ever-expanding 2014 recall list and also the Vehicle at issue in this Complaint) with known defects as well.

71.     New GM has admitted that Old GM knowingly equipped 2003 Saturn Ions (including the Vehicle) with a defective ignition switch that may move out of the "run" position, disabling power steering, power brakes and frontal airbags.

72.     New GM has admitted that Old GM knew, through testing conducted in 2001 and 2002, that the ignition switch was consistently not meeting torque specifications. To avoid slowing the production schedule, however, the switch design release engineer, Ray DeGiorgio, ordered the defective switches to be put into production. The defective switch was then installed in model year 2003 Saturn Ions (including the Vehicle). DeGiorgio continued at New GM after the sale and worked at New GM until 2014.

73.     In 2004, Old GM engineers first reported that the defective ignition switches on the Saturn Ion (and its other vehicles) was so weak and so low on the steering column that a driver's knee could easily bump the key and turn off the vehicle.  At that time, the Old GM engineer perceived

the defect to be serious enough to include in his January 2004 Old GM program report, that "[t]his is a basic design flaw and should be corrected if we want repeat sales."

74.    Nevertheless, Old GM began manufacturing and selling the 2005 Chevrolet Cobalt, a sister vehicle of the Saturn Ion, in 2004, with the same defective ignition key system previously reported and observed.  At a 2004 Old GM press event announcing the launch of the Chevrolet Cobalt, a journalist informed Doug Parks, the Vehicle Chief Engineer for the Cobalt, that while adjusting the seat for the Cobalt he was driving, he inadvertently turned the car off with his knee.  Parks asked Gary Altman, Old GM's Program Engineering Manager for the Cobalt, to attempt to replicate the incident and determine a fix.  Altman drove the Cobalt at Old GM's Milford Proving Grounds with the standard key and key fob, and was able to replicate the incident described by the journalist. Altman reported that incident to Old GM.

75.    In November of that same year, an engineer with Old GM's High Performance Vehicle Operations Group experienced a moving stall during a track test of the Chevrolet Cobalt SS at the Old GM Milford Proving Grounds.

76.    In response to these reports, Old GM launched an engineering inquiry on November 19, 2004, to investigate the potential for the key to move from the "run" to the "accessory/off" position during ordinary driving conditions. This inquiry is known within Old GM as a Problem Resolution Tracking System Inquiry ("PRTS"). The specific complaint which resulted in the PRTS was that the "the vehicle can be keyed off with knee while driving."  On February 1, 2005, as part of the PRTS, Old GM engineers concluded that:

> There are two main reasons that [sic] we believe can cause a lower effort in turning the key: 1. A low torque detent in the ignition switch. 2. A low position of the lock module in the column. (PRTS– Complete Report N172404).

77.     As part of the PRTS, Old GM engineers also began looking into ways to solve the problem of the key moving from the "run" to the "accessory/off" position during ordinary driving.

78.     On November 22, 2004, an Old GM engineer forwarded this complaint to Raymond DeGiorgio, Old GM Design Release Engineer for the ignition switch, and asked if there was a "specification on the force/torque required to keep that switch in the RUN position?  If so, is the switch meeting that spec?"  DeGiorgio advised that he had been discussing the issue of potential changes to the defective ignition switch, but that performing any modifications to the switch to increase the "torque effort" were "close to impossible" as the switch is "very fragile."

79.     On February 18, 2005, Old GM engineers presented several possible solutions to the Cockpit Program Integration Team ("CPIT"). GM engineers determined the only "sure solution" to fixing the problem of the key inadvertently moving from the "run" to the "accessory/off" position required changing from a low mount to a high mount lock module, which would considerably reduce the possibility of the key/key fob being impacted by a driver.

80.     According to Old GM engineers, this change in the key position on the lock module, combined with increasing the detent in the ignition switch, would be a "sure solution." Old GM, however, through Altman, rejected this "sure solution," in part, because the cost to implement the solution would be too high.

81.     During this PRTS, Old GM also considered changing the key from a slot to a hole as a way to attempt to contain this problem, but not as a solution to the problem. Changing the key from a slot to a hole would reduce the lever arm of the key and the key chain. With the slot design, the key chain would hang lower on the key which would increase the torque force on the ignition switch when the chain was contacted or moved in any way. Old GM engineers determined this key

change would significantly reduce the chance of the key inadvertently moving from the "run" to the "accessory/off" position during ordinary driving maneuvers.

82.     An Old GM engineer conducted a cost analysis of this key change and determined that the cost to make this change would be less than one dollar per vehicle or around 57 cents per part. Nevertheless, Old GM rejected this proposed key change and, on March 9, 2005, Old GM closed the PRTS without taking any steps to fix the defective ignition systems in its vehicles.  The PRTS detailed the reasons why Old GM took no action:

> Per GMX001 PEM's [Gary Altrnan] directive we are closing this PRTS with no action. The main reasons are as following: All possible solutions were presented to CPIT and VAPTR: **a.** The lead-time for all the solutions is too long. **b.** The tooling cost and piece price are too high. **c.** None of the solutions seem to fully countermeasure the possibility of the key being turned (ignition turn off) during driving. Thus **none of the solutions represents an acceptable business case.** (emphasis added)

83.     On February 28, 2005, Old GM first issued a bulletin recall to its dealers regarding engine-stalling incidents in certain vehicles it manufactured – or more specifically, in 2005 Cobalts and 2005 Pontiac Pursuits (the Canadian version of the Pontiac G5).

84.     The February 28, 2005, bulletin addressed the potential for drivers of these vehicles to inadvertently turn off the ignition due to low key ignition cylinder torque/effort.

85.     In that first February 28, 2005 recall bulletin, Old GM provided the following recommendations/instructions to its authorized dealers – **but not to the Plaintiffs or the public in general:**

> There is potential for the driver to inadvertently turn off the ignition due to low key ignition cylinder torque/effort.  The concern is more likely to occur if the driver is short and has a large heavy key chain.
>
> In the cases this condition was documented, the driver's knee would contact the key chain while the vehicle was turning.  The steering column was adjusted all the way down.  This is more likely to

> happen to a person that is short as they will have the seat positioned
> closer to the steering column.
>
> In cases that fit this profile, question the customer thoroughly to
> determine if this may the cause. The customer should be advised of
> this potential and to take steps, such as removing unessential items
> from their key chains, to prevent it.
>
> Please follow this diagnosis process thoroughly and complete each
> step. If the condition exhibited is resolved without completing every
> step, the remaining steps do not need to be performed.

86.    At that time, however, Old GM knew that the inadvertent turning off of the ignition in its

vehicles was due to design defects in the ignition system in those vehicles, but failed to disclose

and, in fact, concealed, the February 28, 2005 bulletin information from the public and sent

affirmative representations to dealers that did not accurately describe the nature of the problem.

87.    Indeed, rather than disclosing this serious safety problem that uniformly affected all of its

vehicle owners and distributors, Old GM instead concealed and obscured the problem, electing to

wait until customers brought their vehicles to a dealership after an engine-stalling incident, and

even offered its own dealers incomplete, incorrect, and insufficient description of the defects and

the correct manner in which to remedy them as well.

88.    In March 2005, following its receipt of a customer complaint that his/her Cobalt vehicle

ignition turned off while driving, Old GM opened another PRTS — Complete Report (0793/2005-

US). Steve Oakley, the brand quality manager for the Cobalt, originated the PRTS. As part of the

PRTS, Mr. Oakley reviewed an email dated March 9, 2005 from Jack Weber, a GM engineer. The

subject of the email was "Cobalt SS Ignition Turn Off." In the email Mr. Weber stated:

> I've had a chance to drive a Cobalt SS and attempt to turn off the
> ignition during heel/toe down shifting. Much to my surprise, the first
> time I turned off the ignition switch was during a normal traffic
> brake application on I96. After that I was able to do a static
> reproduction of the condition in a parking lot. I've attached photos
> of the condition with comments. My Anthropometric Measurements
> are attached below:

Static view of keys, fob and registration hitting knee.

Position of RKE fob during normal driving. Dynamic evaluation.

View of steering column cover and Pass Key 3+"lump" under the key slot.

Key in run position, knee contacting the fob and the split ring is pulling on the key to move it to the "off" position. Static evaluation.

Fob has levered around the steering column cover and turned the ignition off.

Unobstructed view of the fob and column cover.

Attached below is documentation of a RAMSIS study performed to attempt to duplicate the real world condition.

Please call at (586) 986-0622 with questions.

Jack Weber

At that time, Mr. Weber had clearly identified the defects in the ignition system in its vehicles for Old GM, but Old GM continued to fail to heed and actively concealed the warnings.

89.    Despite that clear evidence, Old GM engineers still decided not to reconsider any of the proposed solutions discussed during the February 2005 PRTS.  Instead, the Old GM engineers leading the PRTS recommended that sole corrective action GM should recommend would be to advise customers to remove excess material from their key rings, even though Old GM knew that the inadvertent turning off of the ignition in these vehicles was due to design defects in its vehicles, and was not limited to drivers having excess key ring materials.

90.    New GM has admitted that Old GM's Product Investigations group began to study the low torque defect issue in summer 2005, but again Old GM took no action to fix the defect or recall defective vehicles. New GM employees with knowledge of this Old GM knowledge and conduct include, but are not limited to, Kent, Manzor, Altman and Product Investigations manager Doug Wachtel.

91.    In May 2005, Old GM received another customer complaint and opened another PRTS. During that PRTS, Old GM decided to redesign the key in order to reduce the possibility that a driver may inadvertently turn the key from the "run" to the "accessory/off" position during ordinary driving.  Despite that initial safety/redesign commitment, however, Old GM ultimately failed to follow through on its own decision and closed this PRTS without any action, further concealing what it knew from the public and continuing to subject the public, including the Plaintiffs, to the defective vehicles' serious safety risks.

92.    In September of 2005, Old GM first received notice of a defect related accident and death. On July 29, 2005, Decedent Amber Marie Rose, a sixteen-year-old from Clinton, Maryland, had been driving a 2005 Cobalt when she ran off the road and struck a tree head-on.  She had died as a result of the injuries sustained in the crash.

93.    Old GM opened an internal investigation file pertaining to the incident, and during its investigation learned: (1) that the Cobalt the Decedent had been driving was in the "accessory/off" position at the time of the crash, and (2) that the driver's side frontal airbag should have deployed given the circumstances of the accident.  Upon information and belief, Old GM subsequently entered into a confidential settlement agreement with that Decedent's mother, but still, the defect was not corrected or publicly disclosed.

94.    As of February 2005, Old GM's own internal engineers had repeatedly issued reports to the company informing them about the danger of the ignition switch defect discussed in this Complaint, and as early as July of 2005, Old GM was placed on notice that the defect was serious enough to cause a deadly crash.

95.    New GM has admitted that Old GM issued a 2005 Service Bulletin to its dealers, alerting them to the "inadvertent turning off" problem. Old GM, however, deliberately omitted the word

"stall" from the bulletin to avoid attracting the attention of Old GM's regulator, NHTSA. New GM employees with knowledge of this Old GM knowledge and conduct include, but are not limited to, Oakley.

96.    New GM has admitted that in April 2006, DeGiorgio, who had received numerous complaints about the defective ignition switch from other Old GM employees, authorized replacement of the defective switch with one with significantly greater torque. Other Old GM engineers also knew about the part change. DeGiorgio further directed that the change was to be implemented without a corresponding part number change. New GM employees with knowledge of this Old GM knowledge and conduct include, but are not limited to, DeGiorgio.

97.    New GM has admitted that certain employees within Old GM understood no later than 2001 the natural connection between a loss of electrical systems and non-deployment of airbags: if the ignition switch turned to Off or Accessory, the SDM would "drop," and the airbags would therefore be disabled. If a crash then ensued, neither the driver nor any passengers could have the protection of an airbag. New GM employees with knowledge of this Old GM knowledge and conduct include, but are not limited to, product liability attorney Jaclyn Palmer and Field Performance Assessment Engineers John Sprague and Kathy Anderson.

98.    New GM has admitted that the deadly effects of the defective ignition switch on airbag non-deployment began manifesting themselves early on, in crashes about which Old GM was made aware contemporaneously. New GM employees with knowledge of this Old GM knowledge and conduct include, but are not limited to, Sprague, Anderson, engineer Manual Peace, attorneys Palmer, Doug Brown and Deb Nowak-Vanderhoef.

99.    Pursuant to 49 C.F.R. § 573.6, which requires an automobile manufacturer to "furnish a report to the NHTSA for each defect . . . related to motor vehicle safety."

100.    Instead of complying with its legal obligations, however, Old GM fraudulently concealed the ignition switch defects in its vehicles from the public–including the Plaintiffs—and continued to manufacture and sell vehicles with known safety defects.

101.    And further, as a result of its failure to timely expose its knowledge and/or effectively recall its vehicles with known defects/defective parts, in or about 2002, Old GM manufactured and sold the Vehicle at issue in this Complaint, which upon information and belief, was manufactured and designed using the identical and/or substantially similar component parts as those vehicles discussed above and contained the same defective and dangerous ignition switch.

**2)    The Accident Toll Rises – Old GM Investigates Further, But Continues its Concealment and Fraudulent Misrepresentations to the Public**

102.    Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

103.    In December 2005, shortly after it commenced its internal investigation into the incident leading to Amber's death, Old GM issued a Technical Service Bulletin (05-02-35-007) (the "TSB"). The TSB, which GM affirmatively represented applied to 2005–2006 Chevrolet Cobalts, 2006 Chevrolet HHRs, 2005–2006 Pontiac Pursuit, 2006 Pontiac Solstices, and 2003–2006 Saturn Ions, provided, "Information on  inadvertent Turning of Key Cylinder, Loss of Electrical System and no DTCs," provided the following service information:

> There is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort.
>
> The concern is more likely to occur if the driver is short and has a large and/or heavy key chain.  In these cases, this condition was documents and the driver's knee would contact the key chain while the vehicle was turning and the steering column was adjusted all the way down.  This is more likely to happen to a person who is short, as they have the seat positioned closer to the steering column.

> In cases that fit this profile, question the customer thoroughly to determine if this may the cause. The customer should be advised of this potential and should take steps to prevent it - such as removing unessential items from their key chain.
>
> Engineering has come up with an insert for the key ring so that it goes from a "slot" design to a hole design. As a result, the key ring cannot move up and down in the slot any longer - it can only rotate on the hole. In addition, the previous key ring has been replaced with a smaller, 13 mm (0.5 in) design. This will result in the keys not hanging as low as in the past.

104.    At the time Old GM issued this statement, however, Old GM had provided information that was false and misleading. In the two PRTSs Old GM issued before it issued the TSB, Old GM engineers never represented that short drivers or heavy key chains were the reasons why these incidents were happening. Indeed, at the time it issued the TSB, Old GM knew that these incidents were not caused by short drivers with heavy key chains but that they were, instead, caused by safety-related defects in the ignition systems of its vehicles.

105.    In 2005, Old GM began buying back Cobalts from certain customers who were experiencing engine stalling incidents, but never informed the public of that fact. Indeed, Old GM refused to buy back some of the vehicles, despite engine stalling incident complaints, and never informed its customers of the TSB or availability of the key insert alternative.

106.    On November 17, 2005, shortly after Decedent Amber Marie Rose's death report and immediately before Old GM issued the TSB, both mentioned above, there was another incident involving the defect in Baldwin, Louisiana. In that incident, a 2005 Cobalt had run off the road and collided with a tree, and the frontal airbags had not deployed. Old GM received notice of the accident, and opened a file – the "Colbert" file – to investigate, but still did not take action to correct, fix, or publicly report the defect.

107.    On February 10, 2006, shortly after Old GM's issuance of the TSB, another incident occurred in Lanexa, Virginia. There, another a 2005 Cobalt had run off the road and collided with

a light pole, and the frontal airbags had not deployed. The download of the SDM (the vehicle's "black box") showed the key was in the "accessory/off" position at the time of the crash. Old GM received notice of this accident, opened a file, referred to it as the "Carroll" incident, but still did not take action to correct, fix, or publicly report the defect.

108.    On March 14, 2006, in Frederick, Maryland, another 2005 Cobalt accident occurred. In that incident, the vehicle had run off the road, collided with a utility pole, and the frontal airbags had not deployed. The download of the SDM showed the key was in the "accessory/off" position at the time of the crash. Old GM received notice of this incident, opened a file, referred to it as the "Oakley" incident, but still did not take action to correct, fix, or publicly report the defect.

109.    On August 1, 2006, following its receipt of a customer complaint about a Cobalt stalling while driving, Old GM opened yet another PRTS relating to this issue. Old GM closed this PRTS on October 2, 2006 however, without taking any action.

110.    On October 24, 2006, 16 year-old Megan Phillips was driving a 2005 Chevrolet Cobalt that crashed in Wisconsin, killing two of her teenage friends when the car left the road, struck a telephone box and hit a clump of trees ("the October 2006 Crash"). NHTSA assigned Indiana University Transportation Research Center to investigate the crash. The vehicle was inspected on November 6, 2006. NHTSA investigators found that the key had moved from the "run" to the "accessory" position, turning off the engine and disabling the vehicle's airbags before impact.

111.    In October 2006, Old GM updated the TSB (05-02-35-007) to include additional model years: the 2007 Saturn Ion and Sky, 2007 Chevrolet HHR, 2007 Cobalt and 2007 Pontiac Solstice and G5. These vehicles had the same safety-related defects in the Key System as the vehicles in the original TSB. All of the vehicles identified in the original TSB are hereinafter referred to as the "Defective Vehicles."

112.    The October 2006 Crash first came to Old GM's attention on November 15, 2006, through a TV reporter's inquiry. GM's Manager for Safety Communications, Alan Adler, e-mailed Dwayne Davidson, GM Senior Manager for TREAD Reporting (or "SMTR"), copying GM employees Gay Kent (GM Director of PI), Jaclyn Palmer (GM product liability attorney), Brian Everest (GM Engineer), and Douglas Wachtel (GM PI Manager), with the subject line "2005 Cobalt Air Bags - Fatal Crash; Alleged Non-Deployment," asking whether anyone knew about the accident and other airbag incidents involving the Cobalt. In response, Davidson conducted a search of GM's TREAD database and discovered over 700 records of field reports and complaints related to the matter. Wachtel responded by reviewing field actions involving the Cobalt and recommending that GM acquire Event Data Recorder (or "EDR") data. GM employee Christopher Janik responded to Wachtel providing data from the NHTSA database summarizing two Cobalt frontal airbag non-deployment claims. Jaclyn Palmer, a GM "airbag lawyer" who was fired in 2014, forwarded Adler's email to Douglas Brown, another GM "airbag lawyer". Other recipients also responded to the e-mail and provided available data on Cobalt frontal airbag claims.

113.    On December 29, 2006, in Sellenville, Pennsylvania, another 2005 Cobalt drove off the road and hit a tree.  The frontal airbags failed to deploy.  GM was notified, opened a file, and referred to it as the "Freak incident," but still did not take action to correct, fix, or publicly report the defect.

114.    On February 6, 2007, in Shaker Township, Pennsylvania, a 2006 Cobalt incident occurred. In that incident, the vehicle ran off the road and hit a truck.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  GM received notice of this incident, opened a file, and referred to it as the "White" incident, but still did not take action to correct, fix, or publicly report the defect.

115.    On March 29, 2007, NHTSA investigators met with Old GM employees, including Brian Everest and Product Investigations Director Gay Kent, for their Quarterly Review meeting and discussed the high number of airbag non-deployments in Cobalts and Ions. NHTSA informed GM of a July 2005 frontal and fatal crash involving a 2005 Chevrolet Cobalt where the airbags had not deployed. GM was told by NHTSA that the airbags in the Cobalt did not deploy, causing the death of passengers. Data retrieved from the vehicles' diagnostic systems indicated that the ignition was in the "accessory" position.

116.    After the NHTSA meeting, Keith Schultz, Manager of Internal Investigations in GM's Product Investigations Group, ordered Everest and John Sprague, a GM Field Performance Assessment airbag engineer, to compile information on Cobalt and Ion lawsuits and NISMs, and asked GM Senior Manager for TREAD Reporting Dwayne Davidson to pull the TREAD data for similar instances. Sprague generated an Excel spreadsheet listing the various Cobalt accidents and airbag non-deployments.   On May 3, 2007, Schultz sent an email to Everest and Sprague concerning an Investigation Status Review meeting he was attending related to the Cobalt/Ion airbag non-deployment and asked one of them to attend.

117.    In August 2007, Old GM met with its Sensing and Diagnostic Module ("SDM") supplier, Continental, to review SDM data from a crash of a 2005 Chevrolet Cobalt where the airbags failed to deploy.

118.    On August 6, 2007, in Cross Lanes, West Virginia, a 2006 Cobalt rear-ended a truck.  The frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "McCormick" incident, but still did not take action to correct, fix, or publicly report the defect.

119.    In September 2007, the Chief of the Defect Assessment Division within the Office of Defects Investigation ("ODI") of the National Highway Traffic Safety Administration ("NHTSA") emailed other ODI officials and proposed an investigation of "frontal airbag non-deployment [sic] in the 2003-2006 Chevrolet Cobalt/Saturn Ion."  This email went on to state that the:

> ". . . issue was promoted by a pattern of reported non-deployments in VOQ [Vehicle Owners' Questionnaire] complaints that was first observed in early 2005.  Since that time, [the Defects Assessment Division] has followed up on the complaints, enlisted the support of NCSA's Special Crash Investigations (SCI) team, discussed the matter with GM, and received a related EWD Referral. Notwithstanding GM's indications that they see no specific problem pattern, DAD perceives a pattern of non-deployments in these vehicles that does not exist in their peers . . . ."

This email from the Chief of the Defect Assessment Division at NHTSA shows that, as of September 2007, Old GM was deliberately misleading in a report to NHTSA and concealing the defects in its vehicles' ignition systems in violation of federal law.

120.    On September 25, 2007, in New Orleans, Louisiana, a 2007 Cobalt lost control and struck a guardrail.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "Gathe" incident, but still did not take action to correct, fix, or publicly report the defect.

121.    On October 16, 2007, in Lyndhurst, Ohio, a 2005 Cobalt traveled off road and hit a tree. The frontal airbags failed to deploy. Old GM received notice of this incident, opened a file, and referred to it as the "Breen" incident, but still did not take action to correct, fix, or publicly report the defect.

122.    In a March 31, 2008 SCI report commissioned by NHTSA of the October 2006 Crash, the Indiana University Transportation Research Center found that the airbags did not deploy and the SDM data indicated "the vehicle power mode status was recorded as 'accessory'." The report

continued: "The case vehicle's driver and front right passenger air bags did not deploy as a result of the impact with the clump of trees, possibly due to…power loss due to movement of the ignition switch just prior to the impact." The report also cited six other similar complaints in the NHTSA database.

123.    On April 5, 2008, in Somerville, Tennessee, a 2006 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. Old GM received notice of this incident, opened a file, and referred to it as the "Freeman" incident, but still did not take action to correct, fix, or publicly report the defect.

124.    On May 21, 2008, in Argyle, Wisconsin, a 2007 G5 traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position. Old GM received notice of this incident, opened a file, and referred to it as the "Wild" incident, but still did not take action to correct, fix, or publicly report the defect.

125.    On May 28, 2008, in Lufkin, Texas, a 2007 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. Old GM received notice of this incident, opened a file, and referred to it as the "McDonald" incident, but still did not take action to correct, fix, or publicly report the defect.

126.    On September 13, 2008, in Lincoln Township, Michigan, a 2006 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. Old GM received notice of this incident in early 2009, opened a file, and referred to it as the "Harding" incident.  Upon investigating, examining the vehicle, and visiting the crash scene, GM Field Performance Assessment Engineer Lisa Stacey believed this was an incident

where an airbag deployment would have occurred. GM acquired the vehicle and provided the SDM to the SDM manufacturer, Continental, for further analysis, but still did not take action to correct, fix, or publicly report the defect.

127.    On November 29, 2008, in Rolling Hills Estates, California, a 2008 Cobalt traveled off the road and hit a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. Old GM received notice of this incident, opened a file, and referred to it as the "Dunn" incident, but still did not take action to correct, fix, or publicly report the defect.

128.    On December 6, 2008, in Lake Placid, Florida, a 2007 Cobalt traveled off the road and hit a utility pole.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position. Old GM received notice of this incident, opened a file, and referred to it as the "Grondona" incident, but still did not take action to correct, fix, or publicly report the defect.

129.    In February 2009, Old GM opened yet another PRTS with respect to the Defective Vehicles – this time to investigate why the slot in the key in its vehicles allowed the key chain to hang too low in the vehicles, as well as the inadvertent shutting off of the vehicles.  This issue was so commonplace that GM Program Engineering Manager Joseph R. Manson, II wrote to David Trush and Gary Altman stating, "[t]his issue has been around since man first lumbered out of [the] sea and stood on two feet. In fact, I think Darwin wrote the first PRTS on this and included as an attachment as part of his Theory of Evolution."

130.    In March 2009, as a conclusion to the February PRTS, Old GM approved of the design change in the key from the slot to a hole.  According to GM, this redesigned change was implemented in model year 2010 Cobalts.  GM, however, chose not to provide these redesigned keys the owners or lessees of any of the vehicles implicated in the TSB, including the 2003 Ion.

131.    The timeline below gives a short overview of some key points between 2004 and the present, as discussed above:

**2001-2004**

GM learns Key Systems
are defective.

**2005-2009**

GM learns of

hundreds of field

reports of Key

System failures and
multiple fatalities.

**2010-2014**

GM learns of more field
reports of Key System
failures and additional
fatalities.

**2005**

GM engineers' proposed
fix rejected; Amber Rose
dies after airbag fails to
deploy.

**2009**

GM declares and emerges
from bankruptcy.

**2014**

GM issues inadequate
recall over 10 years after
learning its ignition
switch systems are
defective.

132.    Therefore, throughout this entire time period, Old GM and New GM were selling the
Defective Vehicles to consumers for full price, and consumers were purchasing them believing
that the vehicles were non-defective, but all the while Old GM and New GM were concealing the
extent and nature of the defects in the Defective Vehicles.

3)    <u>Old GM's Affirmative Misrepresentations to the Public and the
Bankruptcy Court</u>

133.    Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully
herein.

134.    Also despite its knowledge of the extent and nature of the dangerous defects in its vehicles,
at all times relevant, Old GM marketed and continued to market that its vehicles, although

equipped with defective ignition switches, were safe and reliable when, in fact, the opposite was true.

135.    Since as early as 2001, Old GM knew that the defective design of the ignition switches presented serious safety issues, but rather than replacing the defective ignition switch, or notifying NHTSA of the danger, Old GM expressly and intentionally made it a business decision to continue concealing the defects from the public to boost vehicle sales and maximize profits.

136.    Prior to its bankruptcy filing in 2009, in a section called "safety," on its website, Old GM had included the following statement:

> OUR COMMITMENT
>
> Your family's safety is important to us. Whether it's a short errand around town or a cross-country road trip, Chevrolet is committed to keeping you and your family safe — from the start of your journey to your destination.
>
> That's why every Chevrolet is designed with a comprehensive list of safety and security features to help give you peace of mind. Choose from the safety features below to learn more about how they work, and which Chevy vehicles offer them.

137.    Similarly, it had promoted its Saturn vehicle line on television with statements like, "Putting people first" and in print ad campaigns had featured statements like, "Need is where you begin. In vehicles, it's about things like reliability, durability and, of course, safety. That's where we started when developing our new line of cars" to increase sales.   Thru statements like these, GM clearly made affirmative misrepresentations to the public that its vehicles were safe when, in fact, the company had failed to disclose the known defects.

138.    On June 1, 2009, when Old GM filed bankruptcy in the Southern District of New York, and a New GM was incorporated to, on July 10, 2009, acquire substantially all assets and assume certain liability of Old GM through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy

Code, New GM also fraudulently concealed these ignition defects from the federal Bankruptcy Court as well.

139.    So even as New GM took billions of dollars in taxpayer money from the U.S. Government and obtained the U.S. Government's sponsorship of a plan of reorganization that salvaged the company's very existence, it continued to conceal and failed to disclose its knowledge about the ignition switch defects to the Bankruptcy Court, the U.S. Government, to persons who owned or leased GM vehicles containing the defective ignition switch at that time, and/or to any other interested parties in violation of the law.

### 4)    New GM's Continued Fraudulent Concealment/ Misrepresentation from 2009 Going Forward

140.    Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

141.    After the Bankruptcy Court approved the sale of Old GM to New GM on July 10, 2009, without knowledge of these misrepresentations aforementioned and above, a New GM was formed that not only had assumed the liabilities of Old GM for its bad actions prior to the acquisition but which also possessed its own independent knowledge of the defects in its vehicles and independently chose to continue to conceal the defect as well. From its creation, Defendant New GM, which retained the vast majority of Old GM's senior level executives and engineers as well as Old GM's books and records, knew that Old GM had manufactured and sold millions of vehicles afflicted with the ignition switch defects.

142.    More specifically, New GM had actual knowledge that, because of the way in which the ignition was designed and integrated into the Defective Vehicles, the ignition switch could fail during normal operation, cutting off engine power and certain electrical systems in the vehicles,

which, in turn, would disable key vehicle components, safety features (like airbags), or other vehicle functions, leaving occupants vulnerable to crashes, serious injuries, and death.

143.    In part, New GM's knowledge of the ignition switch defects arises from the fact that key personnel with knowledge of the defects remained in their same positions once New GM took over from Old GM.  For example, the Design Research Engineer who was responsible for the rollout of the defective ignition switch in 2003 was Raymond DeGiorgio.  Mr. DeGiorgio continued to serve as an engineer at Old GM and GM until April 2014 when he was suspended as a result of his involvement in the defective ignition switch crisis.  In the wake of the *Report to the Board of Directors of General Motors Company Regarding the Ignition Switch Recalls*, authored by Anton R. Valukas of Jenner & Block (May 29, 2014) (hereinafter "the Valukas Report"), Mr. DeGiorgio was fired, for he knew about and actively concealed the defect while working for both New GM and Old GM.

144.    Similarly, Gary Altman was the Program Engineering Manager mentioned previously for the Cobalt at Old GM knew about the defect and remained an engineer at GM, all throughout the transition, until he was suspended on April 10, 2014.  Eventually, he was also fired for his role in the ignition switch defect cover-up in the wake of the Valukas Report.  In connection with that investigation, Mr. Altman recently admitted that engineering managers (including himself and Mr. DeGiorgio) knew about ignition switch problems in the Defective Vehicles that could cause them to stall, and disable power steering and power brakes, but that Old GM launched the vehicle anyway because they believed that the vehicles could be safely steered off the road after a stall. Mr. Altman was adamant that "the [Cobalt] was maneuverable and controllable" with the power steering and power brakes inoperable.  Nevertheless, all throughout the relevant period, New GM continued to claim that it did not view vehicle stalling and the loss of power steering as a "safety

issue," but rather as a "customer convenience" issue,[1] and even went so far as to allege that it was not aware that when the ignition switch moves to the "accessory" position, the airbags become inoperable even though New GM itself had previously designed the airbags to not deploy in that exact circumstance.

145.    Mr. DeGiorgio and Mr. Altman were hardly the only employees who retained his Old GM position with Defendant New GM. Other Old GM employees with knowledge of the ignition switch defects and other defects who were retained and given decision-making authority in Defendant New GM include: current CEO Mary T. Barra; Director of Product Investigations Carmen Benavides; Safety Communications Manager Alan Adler; engineer Eric Buddrius, engineer Jim Federico; Vice Presidents for Product Safety John Calabrese and Alicia Boler-Davis; Warranty Engineer William K. Chase; Engineer James Churchwell; Senior Manager for TREAD Reporting Dwayne Davidson; electrical engineer John Dolan; engineer and Field Performance Assessment Engineer Brian Everest; sensing performance engineer William Hohnstadt; Vice President of Regulatory Affairs Michael Robinson; Director of Product Investigations Gay Kent; Product Investigations Engineer Elizabeth Kiihr; engineer Alberto Manzor; Field Performance Assessment Engineer Kathy Anderson; General Counsel and Vice President Michael P. Milliken; Vehicle Chief Engineer Doug Parks; Brand Quality Manager Steven Oakley; Field Performance Assessment Engineer Manuel Peace; Manager of Internal Investigations Keith Schultz; Field Performance Assessment Engineer John Sprague; Field Performance Assessment Engineer Lisa Stacey; Design Engineer David Trush; Product Investigations Manager Douglas Wachtel; in-house counsel Douglas Brown; attorney Michael Gruskin (who at one point headed GM's product litigation team and chaired the Settlement Review Committee from September 2007 to March

---

[1] Valukas Report at pg. 2

2012); in-house product liability attorney Jaclyn C. Palmer; and in-house product liability lawyer William Kemp. These employees' knowledge regarding the ignition switch defect is imputed to New GM, whenever obtained.

146.    A number of Defendant New GM employees were fired or "retired" as a result of the ignition switch scandal, including: Michael Robinson; William Kemp; Ray DeGiorgio; Gary Altman; Jaclyn Palmer; Ron Porter; Lawrence Buonomo; Jennifer Sevigny; Gay Kent; Carmen Benavides; Maureen Foley-Gardner; Jim Federico; John Calabrese; and Brian Stouffer. That New GM chose to fire these employees is further proof that these New GM personnel—and, by imputation, New GM, were complicit in the cover-up of the ignition switch defect that had such disastrous consequences for Plaintiff.

147.    In the recent Decision on Motion to Enforce Sale Order, the bankruptcy court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers, and attorneys, were informed or otherwise aware of the Ignition Switch Defect …"[2] Based on this fact, the court concluded that "Old GM personnel knew enough as of … June 2009 ... for Old GM then to have been obligated, under the Safety Act, to conduct a recall of the affected vehicles." [3] These same 24 personnel necessarily had the same knowledge on day one of New GM's existence, and, under governing Mississippi law, as discussed above, their knowledge is imputed to New GM.

148.    In addition, all the documents discussed herein that were generated prior to the inception of New GM remained in Defendant New GM's files. Given Defendant New GM's knowledge of these documents, and its continuing and ongoing monitoring and reporting duties under the Safety Act, Defendant New GM acquired the knowledge of such documents.

---

[2] *In re Motors Liquidation co.*, No. 09-50026 (REG) (Bankr. Ct. S.D.N.Y. Apr. 15, 2015), at 32.
[3] *Id*. at 33.

149.     In fact, Defendant New GM had ongoing obligations under the Safety Act to monitor Old and New GM vehicles on the road, to make quarterly reports to NHTSA, and to maintain all relevant records for five years. Defendant New GM explicitly accepted Safety Act responsibilities for Old GM vehicles in § 6.15 of the Sale Agreement through which it acquired Old GM.

150.     Additionally, in 2010, the New GM began its own formal investigations into the defect in its vehicles and its deathly consequences.  More specifically, that year, New GM initiated a new investigation into the frontal airbag non-deployment incidents in the Chevrolet Cobalts and Pontiac G5s and subsequently elevated that investigation to a Field Performance Evaluation ("FPE").  GM also received warnings from outside counsel concerning the airbag non-deployments.

151.     At an October 2010 meeting of the SRC, New GM hired King & Spalding ("K&S") to evaluate a 2006 Chevrolet Cobalt fatal crash that occurred on December 31, 2009.[4]  The airbag did not deploy, and, according to the SDM data, the vehicle's power mode status was in the "Off" position at the time of the accident.[5] The matter came to New GM as a NISM; FPAEs Kathy Anderson and John Sprague, along with Jaclyn Palmer, investigated and determined that the airbag should have deployed and that a "sensing anomaly" may have prevented deployment.[6] K&S concluded:

> …the facts and circumstances surrounding the investigation into the sensing system "anomaly" that may be present in some Cobalts could provide fertile ground for laying the foundation for an award for punitive damages, resulting in a significantly larger verdict.[7]

152.     In July 2011, New GM legal staff, Field Performance Assessment ("FPA") engineers and Product Investigation ("PI") personnel met to begin the Field Performance Evaluation ("FPE")

---

[4] Valukus Report at 140-141.
[5] *Id.*
[6] *Id.*
[7] Valukas Report at 142.

process on a group of crashes in which airbags in 2005-2007 Chevrolet Cobalts and a 2007 Pontiac G5 did not deploy during frontal impacts. This investigation also included a review of information related to the Ion, HHR and Solstice which experienced similar problems. At the meeting, Kemp instructed Wachtel to open a PI investigation into the defective ignition switch issue; Wachtel assigned Brian Stouffer (a PI team leader) to investigate the "root cause" but did not set a deadline.[8] Stouffer was given materials from the 2005 Cobalt moving stall investigation and located the December 2005 Service Bulletin as well as TREAD data on airbag non-deployments, but failed to include the MY 2003-2004 Ions in his search.[9]

153.    On July 26, 2011, over six months after the 2010 warning on punitive damages, outside counsel for New GM submitted another Cobalt crash case evaluation.[10] Jaclyn Palmer was the New GM lawyer and Kathy Anderson and John Sprague were the FPA engineers on the case. On February 13, 2011, a 2007 Chevrolet Cobalt driver lost control of the vehicle, traveled off the roadway and ran head-on into a tree on the side of the road.[11] The airbag did not deploy and the driver suffered serious injuries.[12] The data showed that at the time of the accident the vehicle's power mode status was in Accessory.[13] Outside counsel to New GM detailed how New GM engineer John Sprague had seen this problem before in the Cobalt.[14] Outside counsel to New GM again warned New GM of the possibility that "the facts and circumstances surrounding [the Cobalt] investigation ... could provide fertile ground for laying the foundation for an award of

---

[8] Valukas Report at 145.
[9] *Id.*
[10] Valukas Report at 148.
[11] Valukas Report at 148.
[12] Valukas Report at 148.
[13] Valukas Report at 148.
[14] Valukas Report at 149.

punitive damages."[15]  Even New GM's own expert "could not rule out" the defect that caused the airbag not to deploy.

154.    In August 2011, New GM assigned Engineering Group Manager, Brian Stouffer as the Field Performance Assessment Engineer ("FPAE") to assist with the FPE investigation. In the spring of 2012, Stouffer asked Jim Federico, a high level executive and chief engineer at New GM, to oversee the FPE investigation.  Federico was the "executive champion" for the investigation to help coordinate resources for the FPE investigation.

155.    In March 2012, New GM engineers tested the torque on the ignition switches for 2005-2009 Cobalt, 2007, 2009 Pontiac G5, 2006-2009 HHR, and 2003-2007 Ion vehicles in a junkyard. The results of these tests showed that the torque required to turn the ignition switches in most of these vehicles from the "run" to the "accessory/off" position did not meet New GM's minimum torque specification requirements, including the 2008-2009 vehicles.  These results were reported to Stouffer and other members of the FPE.

156.    On April 18, 2012, outside counsel submitted a case evaluation to New GM, including lawyer Jaclyn Palmer. New GM was warned it will be "forced to explain that the airbags did not deploy in this crash because the Cobalt was in Accessory Mode." "It will be difficult to explain why the ignition switch toggled to Accessory Mode simply from running off-road."  New GM was told it will be "forced to contend with other incidents, some of which resulted in deaths, due to the non-deployment of the frontal airbags in the 2005-2007 Cobalt;" and that those incidents put New GM "at risk for imposition of punitive damages."[16]  The case evaluation *explicitly* drew a link between the airbag non-deployment and the vehicle's power mode status of Accessory:

---

[15] Valukas Report at 149.
[16] Valukas Report at 168.

> GM issued [a Technical Service Bulletin] to address the problem of the driver inadvertently turning off the ignition by bumping the key chain with his/her knee while turning the steering wheel if the steering wheel was adjusted too low. This Bulletin addresses a similar problem as that seen in the field where the key in the ignition switch in the 2005 Cobalt could toggle from the Run mode to the Accessory mode by traveling off-road or over rough terrain.[17]

157.    In June 2012, the Plaintiff's independent expert Erin Shipp, P.E., issued her report, which was provided to New GM.[18]  Shipp had not even been provided with discovery material from New GM when she issued her report.[19]  Nonetheless, in preparing her report, Shipp located both the 2005 TSB and the 2007 Indiana University study and reached the same conclusion that New GM had internally known since its inception on the ignition switch defect.  Shipp wrote:

> General Motors knew that the design of the ignition switch was improper and could cause power interruption . . . .  This would include the event as described in the bulletin [a knee striking the key or keychain], but also during events where the vehicle is subject to very rough terrain such as pre-crash events, it is likely that the driver will move within the cabin and those movements would include impact with interior components including the ignition key that is inserted in the ignition switch.[20]

> She then pointed out that airbags will not deploy when the key is in the Accessory position.

> Shipp also referenced the Indiana University study:

> [The data] indicates that before the start of the impact the key was turned to the accessories position in the ignition switch. These indicators are in agreement with the data from the crash report from the NHTSA database by Indiana University.[21]

158.    Shipp concluded:  "General Motors' improper design resulted in a vehicle that was defective in a manner that caused the airbag to not deploy in a crash that General Motors has

---

[17] Id.
[18] Valukas Report at 180.
[19] Valukas Report at 181.
[20] Id.
[21] Valukas Report at 181-82.

determined should have had an airbag deployment."[22]  Outside counsel for New GM transmitted Shipp's expert report to in-house New GM counsel, Jaclyn Palmer on July 6, 2012, and to FPA Engineer Sprague on July 9, 2012.[23]

159.    In September 2012, Stouffer requested assistance from a "Red X Team" as part of the FPE investigation.  The Red X Team was a group of engineers within New GM assigned to find the root cause of the airbag non-deployments in frontal accidents involving Chevrolet Cobalts and Pontiac G5s.  By that time, however, it was clear that the root cause of the airbag non-deployments in a majority of the frontal accidents was the defective ignition switch.  The Red X Team became involved in the investigation shortly after Mr. Stouffer's request.

160.    During the field-performance-evaluation process, New GM determined that, although increasing the detent in the ignition switch would reduce the chance that the key would inadvertently move from the "run" to the "accessory/off" position, it would not be a total solution to the problem.

161.    Indeed, the New GM engineers identified several additional ways to actually fix the problem.  These ideas included adding a shroud to prevent a driver's knee from contacting the key, modifying the key and lock cylinder to orient the key in an upward facing orientation when in the run position, and adding a push button to the lock cylinder to prevent it from slipping out of run.  New GM rejected each of these ideas.

162.    The New GM engineers clearly understood that increasing the detent in the ignition switch alone was not a solution to the problem but New GM concealed – and continued to conceal – from the public, the nature and extent of the defects.

---

[22] Valukas Report at 182.

[23] *Id.*

163.    By 2012, Federico, Stouffer, and the remaining members of the Red X Team knew that the Key System in the Ion, the Cobalt, and the G5 vehicles had safety-related defects that would cause the key to move from the "run" to the "accessory/off" position while driving these vehicles.  They also knew that when this happened the airbags would no longer work in frontal crashes.

164.    Federico, Stouffer, and the other members of the Red X Team also understood that these safety-related defects had caused or contributed to numerous accidents and multiple fatalities.  Despite this knowledge, New GM chose to conceal this information from the public, NHTSA, and the Plaintiffs.

165.    New GM was put on notice and knowledgeable of the necessary facts to conduct a safety recall in advance of the death of the Plaintiff and other New GM customers.

166.    Outside Counsel for New GM warned yet again of punitive damages in May of 2013.  Phillip Holladay, with King & Spalding, submitted a case evaluation with the conclusion that a jury would almost "certainly" find the ignition switch unreasonably dangerous, because low torque would lead to inadvertent shutting off of the engine:

> [The fact finder] will almost certainly conclude that the Cobalt's ignition switch is defective and unreasonably dangerous because the torque effort required to move the key from run to accessory is too low, which leads to inadvertent key movement and the engine shutting off with little or no warning.[24]

> This defect was identified almost immediately after the 2005 Cobalt went into production and there were several newspaper and trade publication articles shortly after the car's launch that flagged the issue.  The issue was assessed internally in a series of investigations conducted as part of the Product Resolution Tracking System, by issuing a [Technical] Service Bulletin in the Fall of 2005 that provided a field service fix for customers who experienced an incident involving inadvertent key movement.[25]

---

[24] Valukas Report at 203-205.
[25] Valukas Report at 203-204.

167.    The death case evaluation catalogued the airbag non-deployment noting this issue has surfaced again as part of an on-going investigation into why frontal airbags have not deployed in high-speed frontal collisions.  Holladay noted "the original Technical Service Bulletin was an inadequate 'band-aid fix' for a significant safety issue that should have been addressed through a recall and design change." Holladay warned New GM, yet again, of "a substantial adverse verdict."[26]  Among the reasons listed: "the ignition switch and key cylinder used on the 2005 Cobalt were problematic from the outset" and "these components were sub-standard and defective."[27]

168.    New GM was warned that the ignition defect had been around from the time that vehicles first "rolled off the assembly line" and yet New GM had "essentially done nothing to correct the problem":

> [T]he ignition switch used on [Crash Victim] 2005 Cobalt was defective and unreasonably dangerous and that it did not meet GM's own torque specifications.
>
> GM has known about this safety defect from the time the first 2005 Cobalts rolled off the assembly line and essentially has done nothing to correct the problem for the last nine years.
>
> [New] GM's failure to take any action in the on-going FPE investigation that has now been dragging on for almost two years as proof positive of [New] GM's [conscious] indifference and willful misconduct when it comes to the safety of its vehicles' occupants.[28]

169.    Under 49 C.F.R. ¶ 573.6, GM had a duty in 2012 to disclose the safety-related defects in the Ion, Cobalt, and G5 vehicles, however, rather than comply with its legal obligations, New GM continued to fraudulently conceal these defects from the Plaintiffs, the public, and the U.S. Government well into 2014.

---

[26] Valukas Report at 204.
[27] *Id.*
[28] Valukas Report at 204-205.

**5)**    **The New GM Continues the Fraudulent Misrepresentation by Promoting its Defective Vehicles as Safe and Reliable from 2009 Going Forward**

170.    Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

171.    Despite its knowledge about the dangerous vehicle defects, since the transition in 2009 going forward, the "New" GM not only continued to fraudulently conceal material facts related to the safety defects in its vehicles, but also continued to make affirmative fraudulent and misleading statements to the public regarding the nature and extent of those safety defects and the dangers they might pose to unaware drivers as well.

172.    More specifically, in advertisements and company literature in 2010, New GM boasted about the safety, reliability, and quality of its vehicles.  For example, in a radio ad that New GM ran from its inception, in July of 2009, until about July 16, of 2010, it stated that, "[a]t GM, building quality cars is the most important thing we can do."

173.    Also, in a 2010 television ad, New GM stated that, "Chevrolet's ingenuity and integrity remain strong, exploring new areas of design and power, while continuing to make some of the safest vehicles on earth."

174.    Further, in its 2011 Annual Report, Defendant New GM affirmatively represented to the public that it was building vehicles in the normal course with an emphasis on design excellence, quality and performance:

> And across the globe, other GM vehicles are gaining similar acclaim for design excellence, quality and performance, including the Holden Commodore in Australia, the Chevrolet Agile in Brazil, the Buick LaCrosse in China and many others.
>
> The company's progress is early evidence of a new business model that begins and ends with great vehicles.  We are leveraging our global resources and scale to maintain stringent cost management

> while taking advantage of growth and revenue opportunities around
> the world, to ultimately deliver sustainable results for all of our
> shareholders.

175.    In its 2012 Annual Report, New GM also falsely indicated that it had changed its structure

to create more "accountability":

> That work continues, and it has been complemented by changes to
> our design and engineering organization that have flattened the
> structure and created more accountability for produce execution,
> profitability and customer satisfaction;

And in that same report, also falsely represented that product quality was a key focus:

> Product quality and long-term durability are two other areas that
> demand our unrelenting attention, even though we are doing well on
> key measures.

176.    Defendant New GM also continued to run these national ad campaigns well into 2013.  In

April of 2013, New GM ran a national print campaign in which it stated that, "[w]hen lives are on

the line, you need a dependable vehicle you can rely on.  Chevrolet and GM … for power,

performance and safety."

177.    Also, in a 2013 Letter to Stockholders, New GM noted that its brand had grown in value

and that it designed the "World's Best Vehicles":

> Dear Stockholder:
>
> Your company is on the move once again. While there were highs
> and lows in 2011, our overall report card shows very solid marks,
> including record net income attributable to common stockholders of
> $7.6 billion and EBIT-adjusted income of $8.3 billion.
>
> GM's overall momentum, including a 13 percent sales increase in
> the United States, created new jobs and drove investments. We have
> announced investments in 29 U.S. facilities totaling more than $7.1
> billion since July 2009, with more than 17,500 jobs created or
> retained.
>
> Design, Build and Sell the World's Best Vehicles

This pillar is intended to keep the customer at the center of everything we do, and success is pretty easy to define. It means creating vehicles that people desire, value and are proud to own. When we get this right, it transforms our reputation and the company's bottom line.

Strengthen Brand Value

Clarity of purpose and consistency of execution are the cornerstones of our product strategy, and two brands will drive our global growth. They are Chevrolet, which embodies the qualities of value, reliability, performance and expressive design; and Cadillac, which creates luxury vehicles that are provocative and powerful. At the same time the Holden, Buick, GMC, Baojun, Opel and Vauxhall brands are being carefully cultivated to satisfy as many customers as possible in select regions.

Each day the cultural change underway at GM becomes more striking. The old internally focused, consensus-driven and overly complicated GM is being reinvented brick by brick, by truly accountable executives who know how to take calculated risks and lead global teams that are committed to building the best vehicles in the world as efficiently as we can.

That's the crux of our plan. The plan is something we can control. We like the results we're starting to see and we're going to stick to it – always.

178.    Despite these ads, however, all throughout the relevant period, Defendant New GM possessed knowledge and information vastly superior to that of consumers about the defective design and function of the ignition switches in its vehicles.

179.    Nevertheless, Defendant New GM made false representations to the public about the quality of its vehicles to boost vehicle sales and maximize profits without ever informing consumers or the public about the potential dangers those defects might present.

180.    In this way, New GM intentionally prioritized profits over public safety and health. For example, one "directive" at New GM was identified in the Valukas Report as "cost is everything;" meaning all levels of employees at GM should focus on controlling costs.[29]

181.    For support, as disclosed in that report, Mark Reuss (former President of GM North America and current Executive Vice President for Global Product Development) had previously stated that New GM "emphasized timing over quality;" "there was resistance or reluctance to raise issues or concerns in the GM culture," and "the atmosphere at GM "discouraged individuals from raising safety concerns." [30]

182.    Since that time, New GM's CEO, Mary Barra, has also noted that New GM engineers were "unwilling to identify issues out of concern that it would delay the launch" of a vehicle.[31]  She said that GM often "pushed back" on describing matters as safety issues, resulting in "GM personnel fail[ing] to raise significant issues to key decision-makers."[32]

183.    In this way, from 2009 going forward, New GM continued to intentionally deceive the public thru affirmative misrepresentations about the quality of its vehicles, to maximize profits, despite the serious, dangerous health and safety risks.

**6)    New GM's Recall of its Vehicles Ten Years Too Late**

184.    Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

185.    At all times relevant herein, alarmingly, both Old GM and New GM knew of the deadly ignition switch defects in its vehicles and their dangerous consequences, but continued to actively

---

[29] Valukas Report at pgs. 249-250.
[30] Valukas Report at pgs. 249-250.
[31] *Id.*
[32] *Id.* at pgs. 252-253.

hide and concealed it from owners, consumers, and the public by failing to recall its vehicles for years.

186.    Rather than publicly admitting the dangerous safety defects in its vehicles, however, both Old GM and New GM attempted to attribute these and other incidents to "driver error," but as a result, every year from 2005 to 2012, received reports of serious incidents in Cobalts involving steering and/or airbag failures, including in:

- 2005:    26 Cobalt Death and Injury Incidents, including 1 death citing "airbag" as the component involved.

- 2006:    69 Cobalt Death and Injury Incidents, including 2 deaths citing "airbag" as the component involved and 4 deaths listing the component involved as "unknown."

- 2007:    87 Cobalt Death and Injury Incidents, including 3 deaths citing "airbag" as the component involved.

- 2008:    106 Cobalt Death and Injury Incidents, including 1 death citing "airbag" as the component involved and 2 deaths listing the component involved as "unknown."

- 2009:    133 Cobalt Death and Injury Incidents, including I death citing "airbag" as the component involved, 1 death citing "service brake" as the component involved, 1 death citing "steering" as component involved, and 2 deaths listing the component involved as "unknown."

- 2010:    400 Cobalt Death and Injury Incidents, including 2 deaths citing "airbag" as the component involved, 12 deaths citing "steering" as the component involved, and I death listing the component involved as  "unknown."

- 2011:    187 Cobalt Death and Injury Incidents, including 2 deaths citing "airbag" as the component involved, 2 deaths citing "steering" as the component involved, and I death listing the component involved as "unknown."

- 2012:    157 Cobalt Death and Injury Incidents, including 5 deaths citing "airbag" as component involved, and 4 deaths citing "steering" as component involved.

187.    Despite these reports, it was not until 2014, after numerous assessments and facing increasing scrutiny of its conduct and the defects in its vehicles, that New GM finally announced its first recall.

188.    More specifically, it was not until February 7, 2014, that New GM, in a letter from Carmen Benavides, Director Product Investigations and Safety Regulations for GM first notified NHTSA that it was conducting Recall No. 13454 for certain 2005-2007 model year ("MY") Chevrolet Cobalts and 2007 MY Pontiac G5 vehicles.  In that letter, New GM represented that as replacement ignition switches had "become available," New GM planned to replace the defective ignition switches, but only on the specific vehicles it had recalled.

189.    On February 19, 2014, a request for timeliness query of that Safety Recall 13454 was sent to NHTSA. The timeliness query pointed out that New GM had failed to recall *all* of the vehicles with the defective ignition switches.  That February 19, 2014 request for timeliness query also asked NHTSA to investigate New GM's failure to previously fulfill its legal obligation to report the safety-related defects in its defective vehicles to NHTSA within five days of discovering that defect.  New GM provided dealers with notice of the recall on February 26, 2014 and March 4, 2014, and mailed letters to current owners on March 10 and March 11, 2014.

190.    On February 24, 2014, New GM in a letter from Carmen Benavides, informed NHTSA it was expanding the recall to include 2006-2007 MY Chevrolet HHR and Pontiac Solstice, 2003-2007 MY Saturn Ion, and 2007 MY Saturn Sky vehicles as well. It was in this letter that New GM acknowledged, **for the first time**, that changes had been made to the ignition switches in certain defective vehicles during the 2007 model year.  Specifically, New GM represented that:

> On April 26, 2006, the GM design engineer responsible for the Cobalt's ignition switch signed a document approving changes to the ignition switch proposed by the supplier, Delphi Mechatronics. The approved changes included, among other things, the use of a

new detent plunger and spring that increased torque force in the
ignition switch.

However, at no time before February 24, 2014 had New GM disclosed this fact or any other prior

knowledge of the defect at all.

191.    On March 28, 2014, GM further expanded its recall to include: 2008-2011 MY Chevrolet

HHR, 2008-2010 MY Chevrolet Cobalt, 2008-2010 MY Pontiac G5, 2008-2010 MY Pontiac

Solstice, 2008-2010 MY Saturn Sky, 2008-2010 MY Opel GT, and 2008-2009 MY Daewoo G2X

vehicles, and on June 13, 2014, GM again extended the recall to include 2010 – 2014 MY

Chevrolet Camaro vehicles as well.

192.    Three days later, on June 16, 2014, GM again extended the recall to also include: 2005-

2009 MY Buick Allure, 2005-2009 MY Buick LaCrosse, 2006-2014 MY Chevrolet Impala, **2000-

2005 MY Cadillac Deville**, 2004-2011 MY Cadillac DTS, 2006-2011 MY Buick Lucerne, 2004-

2005 MY Buick Regal LS & GS, 2006-2008 MY Chevrolet Monte Carlo vehicles.

193.    On June 18, 2014, with the recall count mounting, Defendant New GM's CEO Mary Barra

again testified before the United States House of Representatives Committee on Energy and

Commerce, Subcommittee on Oversight and Investigation, and despite her company's prior claim

that the vehicle stall was merely a "customer convenience," issue in the Valukas Report, finally

admitted that New GM does "consider stalls to be a safety issue."

194.    Since that time, however, as has been brought to light by the Valukas Report and further

confirmed by many former and current New GM employees, Defendant New GM has continued

its attempts to downplay the defect by intentionally avoiding use of the word "stall" in its responses

and reports "because [that] language might draw the attention of NHTSA," and "may raise a

concern about safety, which suggests [that] GM should recall [more] vehicle[s]…"  In fact, certain

GM presentation materials provided to NHTSA during the most recent investigations revealed that

GM has specifically instructed its employees not to use a number of words, including: "bad," "catastrophic," "Corvair-like," "dangerous," "decapitating," "defect," "defective," "eviscerated," "Hindenburg," "inferno," "Kevorkianesque," "life-threatening," "mutilating," "powder keg," "rolling sarcophagus," "safety," "safety-related," "suicidal," "Titanic," and "widow-maker," and instead recommended the words:

- "Issue, Condition [or] Matter" instead of "Problem"
- "Has Potential Safety Implications" instead of "Safety"
- "Broke and separated 10mm" instead of "Failed"
- "Does not perform to design" instead of "Defect/Defective"

195.    As a result, even NHTSA was able to discern New GM's intent to continue to conceal the defect to avoid liability thru its company policy of avoiding certain words.  On May 16, 2014, at a press conference announcing the Consent Order concerning the ignition switch defect, David Friedman, NHTSA' Acting Administrator, announced that:

> GM must rethink the corporate philosophy reflected in the documents we reviewed, including training materials that explicitly discouraged employees from using words like 'defect,' 'dangerous,' 'safety related,' and many more essential terms for engineers and investigators to clearly communicate up the chain when they suspect a problem.

196.    Thus, Old and New GM trained their employees to conceal the existence of known safety defects from consumers and regulators. Indeed, it is nearly impossible to convey the potential existence of a safety defect without using the words "safety" or "defect" or similarly strong language that was forbidden at New GM.

197.    To make matters worse, even after these initial public disclosures, apologies, and announcements by Defendant New GM and despite the investigations and findings of fraud, all known defective GM vehicles still had not yet been recalled.

198.    On June 30, 2014, GM extended the recall yet again to include: 1997-2005 MY Chevrolet Malibu, 1998-2005 MY Oldsmobile Intrigue, 1999-2004 MY Oldsmobile Alero, 1999-2005 MY Pontiac Grand Am, 2000-2005 MY Chevrolet Impala, 2000-2005 MY Chevrolet Monte Carlo, 2004-2008 MY Pontiac Grand Prix, 2003-2014 MY Cadillac CTS, and 2004-2006 MY Cadillac SRX vehicles as well.

199.    Ultimately, because New GM continued to conceal the ignition switch defect and a staggering number of other known safety defects due in large measure to New GM's focus on cost-cutting over safety, its culture of burying safety issues, and its training of employees to avoid using terms such as "stall," "defect," or "safety issue" in order to avoid the attention of regulators, New GM has since been forced to recall nearly 29 million vehicles in the first half of this year and over 15 million vehicles due to the ignition defects alone.

200.    New GM has since appointed a new Vehicle Safety Chief and effectively fired two of their main vehicle engineers and instructed "the dealers . . . to replace the ignition switch,"[33] presumably with one with sufficient torque to prevent the inadvertent shut down of the ignition, power steering, power brakes, and airbags.

201.    In a video message addressed to New GM employees on March 17, 2014, CEO Mary Barra admitted that the Company had made mistakes and needed to change its processes.  According to Ms. Barra, "Something went wrong . . . in this instance, and terrible things happened," but Barra has continued to promise, "We will be better because of this tragic situation if we seize this opportunity."[34]

202.    However, New GM cannot undo the damage already done, and millions of Defective Vehicles remain on the road to this day.  Also, upon information and belief, there are other

---

[33] *Id.* at 6.
[34] *Something Went "Very Wrong" at G.M., Chief Says,* N.Y Times (Mar. 18, 2014).

defective New GM vehicles that have the deadly ignition switch defect or other defective component parts that have not yet been identified or recalled.

203.    Nevertheless, at least, at this point, the fraud has been revealed.  Based upon the recalls at present, and their ever increasing expansion, it has become abundantly clear that Defendant New GM intentionally and fraudulently concealed known safety defects in its vehicles, the vehicles' dangerous propensities to crash, and its resulting noncompliance with safety standards from the public, from NHSTA, from the government, and from the Plaintiffs for years.

### C.    The Impact of GM's Fraud in this Case

204.    Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

205.    The first priority of an auto manufacturer should be to ensure that its vehicles are safe, and particularly that its vehicles have operable ignition systems, airbags, power steering, power brakes, and other safety features that can prevent or minimize the threat of death or serious bodily harm in a collision. In addition, an auto manufacturer must take all reasonable steps to ensure that, once a vehicle is running, it operates safely and its critical safety systems (such as engine control, braking, and airbag systems) work properly until such time as the driver shuts the vehicle down. Moreover, an auto manufacturer that is aware of dangerous design defects that cause its vehicles to shut down during operation, or the vehicles' airbags not to deploy, must promptly disclose and remedy such defects.

206.    Defendant New GM and certain of its employees had actual knowledge of known safety related defects as well as the identified noncompliant component parts in its vehicles, including the 2002 Vehicle at issue in this Complaint.  Despite that knowledge, Defendant New GM took no

action to notify the public or the NHTSA of the known safety related defects until its first recall in February of 2014.

207.    An auto manufacturer should never make profits more important than safety and should never conceal defects that exist in its vehicles from consumers or the public. Defendant's Vehicle Safety Chief, Jeff Boyer has stated that: "Nothing is more important than the safety of our customers in the vehicles they drive." Yet Defendant failed to live up to this commitment.

208.    In making the decision to cover up the ignition switch defect for at least a decade, Defendant New GM consciously put millions of Americans' lives at risk. Defendant New GM knowingly placed on public streets more than one million defective vehicles with the propensity to shut down during normal driving conditions, creating a certainty of accidents, bodily harm, and death.

209.    Only after reviewing the information now available because of the New GM recalls have the Plaintiffs now actually realized the full scope and consequences of Defendant New GM's deception.

210.    Instead of warning the general public about the known defects, Defendant New GM devised a scheme to deceive the public, including the Plaintiffs, by extolling the safety virtues of the defective vehicles through marketing and advertising and failure to warn prior to August of 2008.

211.    Defendant New GM caused an event to occur, out of which this claim arises, in that it designed, tested, manufactured, assembled, installed and/or sold a Vehicle which included defects in its component parts.

212.    Those defects in the design, testing, manufacture, assembly and/or installation were present from the design state and were known, or reasonably should have been known, to Defendant New GM prior to the date of the Vehicle's manufacture, sale, distribution and/or crash.

213.    Defendant New GM is a corporation, and as such can only act through its agents, servants and/or employees and it is liable for the acts and omissions of its agents, servants and/or employees.

214.    As a direct and proximate cause and result of Defendant New GM's acts and/or omissions, Francilla Magee, T.S., N.D., D.D. and V.B. suffered physical injuries on April 26, 2014 and have incurred ongoing emotional and  financial damages for which Defendant GM is liable, as set forth more particularly herein.

## SUCCESSOR LIABILITY

215.    Plaintiffs adopts and re-allege each prior paragraph, where relevant, as if set forth fully herein.

216.    As discussed above, thru the bankruptcy and an asset sale of Old GM, on July 10, 2009, New GM acquired substantially all assets and expressly assumed certain liabilities of Old GM.

217.    More specifically, New GM expressly assumed certain obligations under, *inter alia*, the TREAD Act, and is liable for its non-disclosure and concealment of the ignition switch defects from the date of its formation on July 10, 2009 going forward.

218.    New GM has successor liability for Old GM's acts and omissions in the marketing and sale of the Defective Vehicles and the Vehicle at issue in this Complaint because it has continued the business enterprise of Old GM, for the following reasons:

        a)    New GM admits that it knew of the ignition system defects from the very date of its formation;

b)      New GM has continued in the business of designing, manufacturing, and marketing vehicles, including at least some of the same vehicles as its predecessor, Old GM;

c)      New GM retained the bulk of the employees of its predecessor, Old GM;

d)      New GM acquired owned and leased real property of its predecessor, Old GM, including all machinery, equipment, tools, information technology, product inventory, and intellectual property;

e)      New GM acquired the contracts, books, and records of its predecessor, Old GM; and

f)      New GM acquired all goodwill and other intangible personal property of its predecessor, Old GM.

219.    By reason of the foregoing, as New GM acquired and operated Old GM and ran it as a continuing business enterprise, that transaction constituted a sale of assets amounting to a *de facto* merger or consolidation, such that New GM is a mere continuation of Old GM.

220.    Also, because there was an express and implied assumption of liability by New GM, and it was aware from its inception of the significant ignition switch defects in its vehicles produced, Defendant New GM is liable through successor liability for the deceptive and unfair acts and omissions of Old GM.

## **CONDITIONS PRECEDENT**

221.    All conditions precedent to the bringing of this action and Plaintiff's right to the relief sought herein have occurred, have been performed or have been excused.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Fraudulent Concealment Tolling

222.    Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

223.    Upon information and belief, Old GM has known of the defects in its vehicles since at least 2001 and New GM has known of the defects since the date of its inception on July 10, 2009, and certainly well before the accident at issue in this Complaint occurred on April 26, 2014, yet Defendant New GM and Old GM concealed and/or failed to notify the Plaintiffs, the Dealer and/or the public about the defect prior to the accident at issue in this Complaint.

224.    As of February 2005, Old GM's own internal engineers had repeatedly issued reports to the company informing them about the danger of the ignition switch defect discussed in this Complaint, and as early as July of 2005, Old GM was placed on notice that the defect was serious enough to cause a deadly crash, but rather than replacing the defective ignition switch, or notifying NHTSA of the danger, Old GM expressly and intentionally made it a business decision to continue concealing the defects from the public to boost vehicle sales and maximize profits.

225.    In 2007 and 2010, Defendant New GM and Old GM withheld information from the NHTSA when it knew that the NHTSA was investigating airbag non-deployment in certain GM vehicles. Indeed, NHTSA's understood that airbag systems "were designed to continue to function in the event of a power loss during a crash." This understanding was confirmed by available GM service literature reviewed during NHTSA's due diligence effort. New GM and Old GM, however, had evidence that power loss caused by the ignition switch defect could also prevent the deployment of airbags. Despite its knowledge and familiarity with NHTSA's investigation, Defendant GM withheld this information, which delayed its recall by several years.

226.    Also, on June 1, 2009, when New GM absorbed Old GM thru the bankruptcy sale supervised and approved by the Court, GM also fraudulently concealed the ignition defects from the federal Bankruptcy Court as well, even further evidencing its clear fraudulent intent to escape and shirk liability for its bad actions.   Now, the legitimacy of that sale and the adequacy of consideration are now also in dispute as well.

227.    In February 2014, Defendant New GM instituted only a limited recall, only identifying two of the several models with the ignition switch defect.  Likewise, the later recall expanded to include five additional model years and makes does not fully disclose all the vehicles affected by the ignition switch defect.  On March 28, 2014, New GM expanded the recall yet again to purportedly include all model years of each vehicle affected by the ignition switch recall, however it was not until June 16, 2014 that New GM expand the recall to include the 2002 Cadillac Deville at issue in this Incident.  Since that time, the recall list has again been expanded numerous times, but Defendant New GM has only revealed the scope of the recall in a hazardous, piecemeal fashion, under duress from Congress and intense consumer backlash.

228.    Upon information and belief, there are other New GM and Old GM vehicles that have the ignition switch and other defects that have not yet been disclosed or recalled by Defendant New GM as well.

229.    As Defendant New GM's CEO Mary Barra recently explained during testimony before the House Committee on Energy and Commerce on April 1, 2014, New GM's active concealment of the ignition switch defect was the result of a "cost culture" versus one that placed an emphasis on safety.

230.    Pursuant to 49 U.S.C. § 30118(c), Defendant New GM was obligated and had a duty to disclose the ignition switch defect to the NHTSA when it learned of the defect and/or decided in

good faith that the Defective Vehicles did not comply with an applicable motor vehicle safety standard.

231.    Therefore, any applicable statutes of limitation have been tolled by Defendant New GM and Old GM's wrongful knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

## Estoppel

232.    The Plaintiffs adopt and re-allege each prior paragraph, where relevant, as if set forth fully herein.

233.    Defendant New GM and Old GM were and are under a continuous duty to disclose to purchasers, the Plaintiffs, and the public the true character, quality, and nature of its vehicles.

234.    Defendant New GM and Old GM actively concealed the true character, quality, and nature of the vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles.

235.    The Plaintiffs reasonably relied upon Defendant New GM's knowing and affirmative misrepresentations and/or active concealment of these facts.

236.    Based on the foregoing, Defendant New GM is estopped from relying on any statutes of limitation in defense of this action.

## Discovery Rule

237.    The Plaintiffs adopt and re-allege each prior paragraph, where relevant, as if set forth fully herein.

238.    The causes of action alleged herein did not accrue until the Plaintiffs discovered that the Vehicle had the ignition switch or other defects for which Defendant New GM vehicles have been (or will be) recalled.

239.    Before the accident, the Plaintiffs had no realistic ability or way to discern whether or not the Vehicle had potentially been defective, and the Vehicle was effectively destroyed and totaled when it malfunctioned to cause the crash.

240.    Because Defendant New GM failed to notify purchasers, the Plaintiffs, and the public about the ignition switch defect and other potential defects in its vehicles, the Plaintiffs could have been on notice of or have had any reason to discover the ignition switch and/or any other defects in the Vehicle until after it malfunctioned to cause the crash.

241.    Therefore, any applicable statute of limitation does not apply based upon the facts of this case and lack of effective notice until the June of 2014 recalls as detailed more further herein.

## FIRST CAUSE OF ACTION
## NEGLIGENCE / GROSS NEGLIGENCE

242.    The Plaintiffs adopt and re-allege each prior paragraph, where relevant, as if set forth fully herein.

243.    This Claim is brought under Mississippi law.

244.    Under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement, New GM expressly assumed liability for post-sale accidents involving Old GM vehicles causing personal injury, loss of life, or property damages. New GM also acquired knowledge of Old GM's activities and the defective ignition switch via the mind of the employees, officers, managers, books and records obtained and/or acquired as a result of the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement and subsequent Sale Order. Thus, the acts or omissions of Old GM are part of the foundation for the liability assumed by New GM. New GM also has successor liability for Old GM's conduct as its mere continuation. Further, Plaintiff has claims for a post-sale accident involving an Old GM vehicle that caused personal injury or property damage and New GM is therefore expressly liable to Plaintiff.

245.    Old GM was negligent in designing, inspecting, testing, manufacturing, assembling, marketing, selling, and providing warnings for the Subject Vehicle, including the ignition switch defect, all as set forth in the paragraphs above.

246.    Old GM and Defendant New GM owed foreseeable users, including Plaintiff, a duty to ensure that their vehicles were reasonably safe to operate and did not contain defective components.

247.    Old and New GM owed a duty to warn Plaintiff and other Vehicle purchasers of the ignition switch defect derives because, among other things, it had a continuing duty to monitor and notify Old GM purchasers of defects contained in Old GM vehicles including under the TREAD Act.

248.    Old GM (prior to the Bankruptcy Sale) and New GM (from and after the Bankruptcy Sale) breached their duties to Plaintiff as follows:

249.    Old GM designed, marketed, manufactured, tested, sold, and distributed the Subject Vehicle with a latent, dangerous defect in the ignition switch;

250.    Old GM and New GM failed to warn of the defects; and Old GM and New GM failed to adopt a safer, practical, feasible or otherwise reasonable alternative design that could have then been reasonably adopted to prevent or substantially reduce the risk of harm without substantially impairing the usefulness, practicality, or desirability of the Subject Vehicle.

251.    New GM is also liable for actions prior to the Bankruptcy Sale as Old GM's mere continuation.

252.    Old GM and Defendant New GM failed to warn about the dangers related to the Subject Vehicle set forth above and throughout this Third Amended Complaint. Both Old GM and Defendant New GM (who stands in Old GM's shoes and who acquired knowledge from Old GM's employees and books and records at the time of the closing of the sale and obtained its own

knowledge after the Sale) knew, or in the exercise of reasonable diligence, should have known that the Subject Vehicle was dangerous when put to its intended use.

253.    At all times relevant herein, both Old GM and Defendant New GM (who stands in Old GM's shoes and who acquired knowledge from Old GM's employees and books and records at the time of the closing of the sale and obtained its own knowledge after the sale and is Old GM's mere continuation) knew or, in the exercise of reasonable diligence, should have known that the ignition switch in the Vehicle was a dangerous instrumentality if not properly designed, manufactured, tested, inspected, or fixed and that the Vehicle, therefore, presented the probability of harm to any foreseeable users unless it was free from all defects.

254.    At all times relevant herein, Old GM knew or, in the exercise of reasonable diligence, should have known that the ignition switch in the Vehicle was defective and/or unable to withstand the Vehicle's normal and reasonable operations in the normal course, but did nothing to warn or protect against the problem prior to the time the Plaintiffs' accident occurred.

255.    At all relevant times herein, Defendant New GM (who stands in Old GM's shoes and who acquired knowledge from Old GM's employees and books and records at the time of the closing of the sale and obtained its own knowledge after the sale and is Old GM's mere continuation) also knew or, in the exercise of reasonable diligence, should have known that the ignition switch in the Vehicle was defective and/or unable to withstand the Vehicle's normal and reasonable operations in the normal course, but did nothing to recall, remedy, warn, or protect against the problem prior to the time the Plaintiffs' accident occurred.

256.    As a result, at all times relevant herein, both Old and Defendant New GM (who stands in Old GM's shoes and who acquired knowledge from Old GM's employees and books and records

at the time of the closing of the sale and obtained its own knowledge after the sale and is Old GM's mere continuation) had a duty to foreseeable users, and to the Plaintiff, in particular, to:

a)    Inspect the Vehicle so as to determine whether it would be reasonably fit for its intended uses; and

b)    Warn or give fair and adequate notice of the inherently dangerous condition existing as a result of the negligent design and manufacture of the Vehicle; and

257.    At all times relevant herein, Old GM breached those duties described above in that it negligently and carelessly failed to warn plaintiff of the inherently dangerous condition of the Vehicle, failed to inspect or test the Vehicle to determine whether it was reasonably fit for the its intended uses prior to the accident, and failed to protect against the problem.

258.    At all relevant times herein, Defendant New GM (who stands in Old GM's shoes and who acquired knowledge from Old GM's employees and books and records at the time of the closing of the sale and obtained its own knowledge after the sale and is Old GM's mere continuation) breached those duties described above in that they negligently and carelessly failed to warn plaintiff of the inherently dangerous condition of the Vehicle, failed to inspect or test the Vehicle to determine whether it was reasonably fit for the its intended uses prior to the accident, and failed to adequately recall and fix the defect.

259.    Old GM and Defendant New GM had no reason to believe that the foreseeable user would know of the dangerous conditions of the Subject Vehicle. Old GM and Defendant New GM negligently warned or failed to warn about the dangerous conditions.

260.    Old GM and Defendant New GM were negligent because they failed to do what reasonably prudent actors would have done in a similar situation.

261.    Further, a reasonably prudent actor, under the same or similar conditions as Old and New GM, would have recalled the Defective Ignition Switch Vehicles well before the Plaintiffs' accident and/or warned the owners of those vehicles as soon as it learned of the defect. Old and New GM knew of the defective ignition switches long before the Plaintiffs' accident, yet chose to do nothing to protect the Plaintiffs or those like them.

262.    At all times relevant herein, as a direct and proximate result of Old GM's design, manufacture and sale of a Vehicle with unreasonably dangerous and defective component parts, including the ignition switch, and the failure or refusal of Old GM before the Sale and New GM after the Sale, to adequately warn, Plaintiffs were injured and have suffered damages.

263.    More specifically, such negligent acts and/or omissions by Old GM include, but are not limited to:

a)      Its failure to properly design and install the Vehicle's component parts;

b)      Its failure to properly draft and draw design drawings for the Vehicle's component parts;

c)      Its failure to properly manufacture the Vehicle's component parts;

d)      Its failure to properly inspect, test and audit the Vehicle's component parts;

e)      Its failure to properly assemble the Vehicle's component parts;

f)      Its failure to supervise the design, testing, assembly, installation, and/or delivery of the Vehicle and/or its component parts;

g)      Its failure to properly test the Vehicle to ensure' the design provides reasonable occupant protection in the event of a crash;

h)      Its failure to disclose known problems and defects;

i)      Its failure to comply with the standards of care requisite in the automotive industry insofar as providing reasonable occupant protection in the event of a crash;

j)      Its failure to comply with Defendant GM's own internal safety standards;

k)      Its failure to comply with applicable motor vehicle safety standards;

l)      Its failure to oversee the testing procedure;

m)      Its failure to adequately warn prior to sale and post-sale;

n)      Its failure to inspect for defects;

o)      Its failure to timely implement a safety recall campaign;

p)      Its failure to properly correct a known hazardous product;

q)      Its failure to manufacture a Vehicle that was safe for its intended purpose;

r)      Its failure to procure safe component parts;

s)      Its failure to reasonably and safely choose suppliers of component parts; and

t)      Its failure to otherwise exercise reasonable and ordinary care under the circumstances.

264.    The foregoing negligent acts and/or omissions of Old GM and Defendant New GM were a producing and/or proximate cause of Plaintiffs' damages.

265.    As Old GM's successor and mere continuation, New GM is liable to the Plaintiffs for damages based on Old GM's conduct.

266.    New GM is also liable to the Plaintiffs for punitive damages based solely on New GM's conduct and knowledge, including information inherited from Old GM and obtained by New GM after the Sale.

267.    By reason of the foregoing, as a direct and proximate result of Defendant GM's negligent, grossly negligent, and careless acts and/or omissions, the Francilla Magee, T.S., N.D., D.D. and

V.B. suffered injuries on April 26, 2014, thus rendering New GM liable to Plaintiff for damages in an amount to be determined at trial.

268.   WHEREFORE, the Francilla Magee, T.S., N.D., D.D. and V.B. demand judgment against Defendant GM as described in further detail below.

269.   New GM is further liable for fair and reasonable damages for medical expenses, and/or damages as may be determined by the Court or the jury, as well as costs, expenses, and reasonable attorneys' fees.

**SECOND CAUSE OF ACTION**
**STRICT LIABILITY**

270.   The Plaintiffs adopt and re-allege each prior paragraph, where relevant, as if set forth fully herein.

271.   At all times relevant herein, Defendant New GM and Old GM are and were engaged in the business of designing, manufacturing, testing, assembling, planning, engineering, constructing, building, inspecting, marketing, advertising, distributing and selling motor vehicles to be used by the general public in the State of Mississippi, including the Vehicle at issue in this Complaint.

272.   At all times relevant herein, Defendant New GM and Old GM are and were "manufacturers" of motor vehicles as that term is defined by Mississippi law and are and were in the business of manufacturing designing, testing, assembling, planning, engineering, constructing, building, inspecting, marketing, advertising, distributing and selling motor vehicles directly and/or by and through various agencies and distributors in the State of Mississippi to be used by the general public, including the Vehicle at issue in this Complaint.

273.   At all times relevant herein, Old GM designed, manufactured, distributed, and sold the aforementioned Vehicle and/or its component parts in a dangerous, defective, and hazardous manner and condition such that, pursuant to Mississippi law, when it left Old GM's control, it

deviated in a material way from the design specifications or performance standards of Old GM and/or from otherwise identical units manufactured to the same design specifications or performance standards. As detailed below, New GM expressly assumed liability for this claim against Old GM, the manufacturer of Plaintiff's Vehicle.

274.    New GM assumed liability under Section 2.3 of the Sale Agreement for "Product Liabilities" that arose out of "accidents" or "incidents" that occurred on or after the 2009 closing date.

275.    At all times relevant herein, the subject Vehicle was defective and unreasonably dangerous in its design as certain parts, including the ignition switch, the power steering, and brake functions, were manufactured and/or installed improperly and had the propensity to malfunction and cause a loss of driver control such that the foreseeable risks associated with its design or formulation exceeded the benefits associated with that design or formulation pursuant to Mississippi law.

276.    At all times relevant herein, the subject Vehicle was defectively designed or formulated pursuant to Mississippi law by Old GM as it was not crashworthy and was unreasonably dangerous for foreseeable users and occupants on April 26, 2014, yet both Defendant New GM and Old GM failed to warn of the inherent and latent defects that made the Vehicle unsafe for its intended use.

277.    At all times relevant herein, the subject Vehicle also did not conform to representations made by Old GM pursuant to Mississippi law, and Old GM had knowingly manufactured, supplied, sold, warranted as safe, and placed on the market and into the stream of commerce a defective product, unreasonably dangerous to consumers, knowing that it would reach consumers in that defective condition without substantial change once it left Old GM's control.

278.    At all times relevant, Old GM defectively designed, manufactured, tested, assembled, planned, engineered, constructed, built, inspected, distributed and sold  the subject Vehicle and its

component parts, including its ignition switch, power steering, and brakes, to one of its designated dealerships in or about early 2002.

279.    At all times relevant herein, the defective condition of said Vehicle had already rendered the vehicle unreasonably dangerous by the time of its first sale, distribution, and purchase.

280.    At all times relevant herein, the subject Vehicle had not been changed or altered in any material respect from the time that it was manufactured and sold by Old GM to the time and place of the accident and was in substantially the same condition at the time of the accident as when it left Old GM's possession and control.

281.    At all times relevant herein, New GM has assumed liability for Products Liability claims for compensatory damages involving Old GM vehicles post-sale and therefore stands in Old GM's shoes as manufacturer pursuant to governing Mississippi law. New GM is also liable for Old GM's conduct as its mere continuation.

282.    At all times relevant herein, as a result of the unsafe and unreasonably dangerous defective condition of the Vehicle and its component parts, including the ignition switch, the power steering, and brake functions, the Francilla Magee, T.S., N.D., D.D. and V.B. became injured in a crash on April 16, 2014.

283.    At all times relevant herein, the defective nature of the Vehicle was a direct and/or proximate cause of the injuries of the Francilla Magee, T.S., N.D., D.D. and V.B., thus rendering Defendant GM strictly liable for the accident and injuries sustained by the Plaintiffs to damages in an amount to be determined at trial.

284.    WHEREFORE, the Francilla Magee, T.S., N.D., D.D. and V.B. demand judgment against Defendant GM as described in further detail below.

## THIRD CAUSE OF ACTION
## FRAUDULENT CONCEALMENT

285.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint. Plaintiff bases this claim on Old GM's knowledge and conduct to the extent New GM inherited information from Old GM employees and documents. Plaintiff separately bases this claim on Old GM's knowledge and conduct to the extent New GM is liable as Old GM's successor. Further, Plaintiff does not base this claim on affirmative misrepresentations Old GM or New GM made to Plaintiff.

286.    Defendant New GM engaged in fraud based on concealment.

287.    At all times relevant herein, Old GM and Defendant New GM consistently failed to disclose and actively concealed from Plaintiff the risks of death, personal injury, and property damage posed by its products.

288.    Old GM and Defendant New GM concealed and suppressed material facts concerning the Subject Vehicle, including the defect in the ignition switch and the safety of the Subject Vehicle.

289.    As described above, Old GM and Defendant New GM made material omissions regarding the Subject Vehicle.

290.    Old and New GM intentionally concealed material facts from the Plaintiffs, NHTSA, and the public in general, and it continues to do so today. Old and New GM knew that the Defective Ignition Switch Vehicles, including the 2002 Cadillac Deville were designed and manufactured with ignition switch defects, but Old and New GM concealed those material facts, as set forth herein. Although the Defective Ignition Switch Vehicles contain safety-related defects about which Old and New GM knew, or should have known, Old and New GM recklessly concealed that information from consumers in the United States. Those consumers, including the Plaintiffs, had no knowledge of the safety-related defects.

291.    Old and New GM had a duty to disclose the facts to the Plaintiffs, the public who owned defective Old and New GM vehicles, and NHTSA, but failed to do so.

292.    Old and New GM knew that the Plaintiffs had no knowledge of the concealed facts, and that she did not have an equal opportunity to discover the concealed facts. Old and New GM were in a position of superiority over the Plaintiffs. Indeed, the Plaintiffs trusted Old and New GM not to allow defective vehicles for which it was responsible to remain in the marketplace. The Plaintiffs further trusted Old and New GM to warn of defects and to recall defective vehicles.

293.    Old and New GM had a duty to disclose the facts to Plaintiff because: (1) Old and New GM knew that Plaintiff was ignorant of the material facts that Old GM and New GM intentionally concealed; (2) Plaintiff did not have an equal opportunity to discover the material facts that Old and New GM intentionally concealed; and (3) Old and New GM had notification and recall obligations under the Safety Act with respect to Old GM vehicles, including a continuing duty to monitor and notify Old GM purchasers of defects.

294.    By failing to disclose these material facts, Old and New GM intended to hide information regarding the defect, mislead, avoid suspicion, or prevent further inquiry into the matter by NHTSA, the Plaintiffs, and the public in general. Old and New GM further intended to induce NHTSA not to recall the 2002 Cadillac Deville, as well as other Defective Ignition Switch Vehicles, in order to reduce its eventual financial exposure.

295.    Old and New GM intentionally concealed the fact that Plaintiff's Vehicle had the ignition switch defect and was unsafe from the Plaintiffs. By failing to disclose these material facts, Old and New GM intended to induce the Plaintiffs to take some action or refrain from acting. Had the Plaintiffs known that her vehicles had these serious safety defects, she would either have stopped driving the Vehicle or sold the Vehicle. The Plaintiffs reasonably and justifiably relied on Old and

New GM's non-disclosure and were injured as a result of acting without knowledge of the undisclosed facts.

296.    The Plaintiffs reasonably relied on Old and New GM's nondisclosure, and reasonably but unknowingly continued to use the 2002 Cadillac Deville until the date of the accident.

297.    The Plaintiff Francilla Magee would not have continued to drive, or would have sold, the 2002 Cadillac Deville had she known of the ignition switch defect.

298.    Old and New GM reaped the benefits of their failure to disclose and active concealment of the Defective Ignition Switch because they did not disclose the defects to the public and to NHTSA.

299.    As a direct and proximate result of Old and New GM's wrongful conduct and fraudulent concealment, the Plaintiffs suffered damages described herein.

300.    New GM's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Plaintiffs, such that punitive damages are appropriate (based on New GM's knowledge and conduct, including information inherited from Old GM and obtained by New GM after the Sale), as well any other damages deemed appropriate by the Court and/or jury, including costs, expenses, and attorneys' fees.

301.    Old GM's conduct was also knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Plaintiffs. Punitive damages for Old GM's conduct are appropriate, and New GM is liable for such damages as Old GM's successor.

## **DAMAGES**

302.    The Plaintiffs adopt and re-allege each prior paragraph, where relevant, as if set forth fully herein.

303.    As a direct and proximate result of Defendant GM's negligence, Francilla Magee, T.S.,

N.D., D.D. and V.B. have sustained severe personal injuries, continuing physical, emotional and psychological injuries due to the collision as can best be described by their treating physicians.

304.    Plaintiff Francilla Magee has suffered and continues to suffer from serious and debilitating permanent injuries including, but not limited to, back and neck pain, bruising, and contusions to her body as a result of the Incident, a more complete description of which can be ascertained from her treating physicians.

305.    Minor Plaintiff T.S. has suffered and continues to suffer from serious and debilitating permanent injuries including, but not limited to, back and neck pain, bruising, and contusions to her body as a result of the Incident, a more complete description of which can be ascertained from her treating physicians.

306.    Minor Plaintiff N.D. has suffered and continues to suffer from serious and debilitating permanent injuries including, but not limited to, back and neck pain, bruising, and contusions to her body as a result of the Incident, a more complete description of which can be ascertained from her treating physicians.

307.    Minor Plaintiff D.D. has suffered and continues to suffer from serious and debilitating permanent injuries including, but not limited to, a fractured left foot, back and neck pain, bruising, and contusions to his body as a result of the Incident, a more complete description of which can be ascertained from his treating physicians.

308.    Minor Plaintiff V.B. has suffered and continues to suffer from serious and debilitating permanent injuries including, but not limited to, lacerations, chest pain, back and neck pain, bruising, and contusions to her body as a result of the Incident, a more complete description of which can be ascertained from her treating physicians.

309.    By reason of the foregoing, Plaintiffs Francilla Magee, T.S., N.D., D.D. and V.B. further

pleads their injuries and damages, as follows:

    a)      Past, present and future medical and rehabilitation expenses;

    b)      Past, present and future pain, suffering and psychological anguish that caused and will continue to cause Plaintiffs to lose enjoyment of their lives;

    c)      Impairment of health, strength and vitality; and

    d)      Other such injuries, damages, and particulars as the evidence may show.

310.    At all times relevant herein, all of the aforesaid injuries and damages were caused solely and proximately by the wrongful acts and/or omissions of Defendant GM.

311.    WHEREFORE, Plaintiffs demand judgment against Defendant GM for compensatory damages and such other and further relief as this Honorable Court or jury may deem just and proper at trial.

## PUNITIVE DAMAGES

312.    The Plaintiffs adopt and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

313.    At all times relevant herein, Defendant New GM acted with a conscious and flagrant disregard for the rights and safety of the Plaintiffs Francilla Magee, T.S., N.D., D.D. and V.B., and the general public and/or deliberately engaged in willful, wanton and reckless disregard for the life and safety of the Plaintiffs and the general public by failing to disclose the known defects in its vehicles.

314.    Although Defendant New GM knew the defects alleged herein were contained in the Vehicle and could cause severe injury and loss of life, New GM took no steps to correct, warn or protect the Plaintiffs or the consumer public from those known defects.

315.    The actions and inactions of Defendant New GM were of such a character as to constitute a pattern or practice of willful, wanton and reckless misconduct causing substantial harm and resulting in damages to the Plaintiffs.

316.    In addition, the wrongful acts of the Defendant were committed with specific intent to cause harm to the Plaintiffs, and Defendant succeeded in so doing.

317.    Therefore, Defendant New GM and/or its agents and servants engaged in conduct that demonstrates malice, aggravated or egregious fraud, oppression, or insult, which injured the Plaintiffs, thereby entitling the Plaintiffs to punitive damages.

318.    Additionally, the wrongful acts of the Defendant New GM constitute willful misconduct, malice, fraud, wantonness, oppression and that entire want of care which would raise the presumption of conscious indifference to consequences and the rights of others, thereby also entitling Plaintiffs to punitive damages.

319.    WHEREFORE, the Plaintiffs Francilla Magee, T.S., N.D., D.D. and V.B. demand judgment against Defendant New GM for punitive and exemplary damages, plus interest, costs and attorneys' fees for having to bring this action, and such other and further relief as this Honorable Court or jury may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs Francilla Magee, T.S., N.D., D.D. and V.B. pray as follows:

320.    For a trial by jury and judgment against Defendant New GM for such sums as actual and other compensatory damages, including pain and suffering, in any amount to which he may be entitled under the laws of the State of Mississippi as a jury may determine and in excess of the minimum statutory and/or jurisdictional limit of this Honorable Court.

321.    For exemplary and punitive damages against Defendant New GM, in an amount as a jury may determine to halt such conduct and in excess of the minimum statutory and/or jurisdictional limit of this Honorable Court.

322.    For pre-and post-judgment interest and the costs of this suit, including attorney's fees.

323.    For such other and further relief to which they may be entitled and as this Honorable Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all allegations, claims and causes of action asserted herein.

Dated: February 10, 2017

Respectfully submitted,

**MOTLEY RICE LLC**

By:     */s/ Donald A. Migliori*
Donald A. Migliori (SDNY Bar # DM1098)
Kevin R. Dean, Esq. (SC Fed. Bar #8046)
John David O'Neill, Esq. (SC Fed. Bar # 12472)
28 Bridgeside Boulevard
Mount Pleasant, SC  29465
Phone: (843) 216-9000
Fax: (843) 216-9450
dmigliori@motleyrice.com
kdean@motleyrice.com
jdoneill@motleyrice.com

John H. Ott, Esquire
OTT LAW FIRM
P.O. Box 1684
McCombs, MS 39649
Phone: (601) 684-6155
Fax: (601) 249-0264
Ottlaw2@bellsouth.net

Gary L. Honea, Esquire
HONEA LAW FIRM, PLLC
209 Apache Drive
McComb, MS 39648
Phone: (601) 250-5687
Fax: (601) 250-5690
honealawfirm@bellsouth.net

*Attorneys for Plaintiffs*